**Carlyne CAMPBELL, Plaintiff,**

v.

**The SEABURY PRESS and Will D. Campbell, Defendants.**

**Civ. A. No. CV78–P–920–S.**

United States District Court,
N. D. Alabama, S. D.

Aug. 14, 1979.

---

Stephen D. Heninger, Hare, Wynn, Newell & Newton, Birmingham, Ala., for plaintiff.

Alfred H. Knight, III, Willis & Knight, George E. Barrett, Barrett, Lenahan, Kniffen & Ray, James N. Bryan, Jr., Woods & Woods, Nashville, Tenn., for Will D. Campbell.

Hobart A. McWhorter, Jr., Linda Friedman, Bradley, Arant, Rose & White, Birmingham, Ala., Renee L. Cohen, Rudolph W. Giuliani, Patterson, Belknap, Webb & Tyler, New York City, for Seabury Press.

## MEMORANDUM OF OPINION

POINTER, District Judge.

Plaintiff brings this action for libel and invasion of privacy against Will D. Campbell, the author of "Brother to a Dragonfly," and against the Seabury Press, the book's publisher. Defendants have each filed a motion to dismiss as to the libel claim and for summary judgment as to the claim for invasion of privacy. These motions are presently before the court.

"Brother to a Dragonfly" is the author's portrayal of his own life, particularly of his role as a white leader in the civil rights movement in the South, and, of most concern to the present case, his relationship with his now-deceased brother Joe. The author regards Joe as a major influence on the course his life was to take and as a source of support and religious inspiration. The relationship between the brothers is traced from childhood, but a large portion of the book is devoted to an account of Joe's addiction to drugs from the shelves of his pharmacy and the effects of that addiction on his personality, on his family life, and on Will. The plaintiff, Carlyne Campbell, was Joe's first wife, and several incidents involving her or discussions between Joe and Will about her are described.

Plaintiff claims that the "essence of the entire book" was defamatory to her, and cites two passages of the book she considers libelous per se.[1] One passage she characterizes as an imputation of unchastity and the other of lack of veracity. Section 6–5–181 of the Alabama Code (1978) provides that words falsely imputing unchastity to a woman are actionable without proof of special damages, that is, actionable per se. It

---

1. Plaintiff does not plead special damages.

**300**

is also apparent that an imputation of dishonesty may constitute libel per se under some circumstances. *Ferdon v. Dickens*, 161 Ala. 181, 49 So. 888 (1909).

The passage cited by plaintiff as an imputation of unchastity is found on page 102 of a 268 page book:

> "We better get over there. Have to practice, you know. Sug, you come too. You can watch us practice marriage. How the hell do you practice marriage, Brother? And in a churchhouse?" Brenda allowed that the practice came later. She said it was all practice, being married. Like practicing law or practicing medicine, but Joe already had his words ready. " 'Course, we been practicing a little bit already." Then he turned to both of us and grew calm and serious. "No. I was just kidding. She's a good girl. She's pure. Pure as Mary. You're going to love her. Believe me."

The quoted language, a dialogue between Joe and the author's wife Brenda, clearly refers to plaintiff and is spoken during a discussion of plaintiff's upcoming marriage to Joe and his need to go to the church for the wedding rehearsal. The court, on this motion to dismiss for failure to state a claim, must initially determine whether the language is capable of a defamatory meaning. *Albert Miller & Co. v. Corte*, 107 F.2d 432 (5th Cir. 1939), *cert. denied*, 309 U.S. 688, 60 S.Ct. 890, 84 L.Ed. 1031 (1940). In doing so, the publication must be read as a whole (*Berry v. City of New York Insurance Co.*, 210 Ala. 369, 98 So. 290 (1923)), and "the printed words are to be taken in their natural meaning, and according to the sense in which they appear to have been used and the idea they are adapted to convey to those who read them." *McGraw v. Thomason*, 265 Ala. 635, 639, 93 So.2d 741, 744 (1957).

Joe's language referring to "practicing marriage" is certainly ambiguous read out of context; it would not necessarily refer to premarital sexual intimacy or unchastity. Joe's last sentence in the passage clears the ambiguity, but in the same breath denies that the earlier remark was true. The

reader is left with the impression that plaintiff was not unchaste, especially in light of Joe's later remarks, after Will suggests that Joe's second wife move in with Joe before marriage, that he'd "have to take fifty baths if I did something like that before getting married." (p. 212)

At page 155 is the passage plaintiff claims attributes to her character of untruth:

> Finally he [Joe] did admit that things were not too pleasant. "But you know how Carlyne is. You can't pay any attention to what she says." I reminded him of the backlog of evidence but he masterfully parried it off. I insisted that both of them go for marriage counseling. His answer was that he had been for that for two years but that Carlyne would not agree. As humoring gesture, I said that maybe Carlyne did stretch the truth at times, may even be a chronic liar, but the marriage was certainly worth saving. He promised to try to get her to seek help.
>
> It took only a few hours for my counseling to come back to haunt me. Again, after all of us were in bed, I heard a scream coming from the living room. I ran down the hall just in time to see Carlyne retreating in the opposite direction with Joe following close behind, cursing and threatening as he went. Standing like a midget before a giant, I heard myself saying words which were not my own: "Goddammit, sit down or I'll knock the hell out of you." It stunned him as it did me. He slumped into a chair and I realized that I was standing in the middle of the floor with both fists clenched into hard-knuckled balls. He could have picked me up with one hand. But he made no sign of defiance toward me.
>
> "No, Joe, nothing's wrong. Everything's fine!"
>
> I turned to follow Carlyne and found her in the basement crying. She refused to let me comfort her. "No, you don't want to talk to me. I'm just a chronic liar." My clinical words of the afternoon had

become one more weapon which Joe could use to cut her down—"Would you believe something if Will said it? Well, he says you are a chronic liar."

It is clear from the quoted passage that the author did not believe that plaintiff was a "chronic liar" at the time he made the statement to his brother, Joe, but that the statement was "a humoring gesture." It is clear from the remainder of the book that events she recounted that Joe did not want Will to believe did in fact happen—that she had been truthful.

The court further finds that the publication does not "[expose] the plaintiff to public ridicule or contempt," *Ceravolo v. Brown*, 364 So.2d 1155, 1157 (Ala.1978), but that she is "sympathetically shown as the suffering and patient wife of a rapidly deteriorating man." (Defendant's brief at p. 3) Because of the court's finding that the ordinary, reasonable reader could not find the publication to be defamatory, plaintiff's libel claim is due to be dismissed.

■ Defendants' motions for summary judgment on plaintiff's claim for invasion of privacy is based on their defense that the matter published is of general or public interest. That defense or "privilege" has been defined by the Alabama Supreme Court as follows:

[T]he right of privacy does not prohibit the broadcast of matter which is of legitimate public or general interest. . . .
"It does not exist * * * in the ordinary dissemination of news and events, nor in connection with the life of a person in whom the public has a rightful interest, nor where the information would be of public benefit."

*Smith v. Doss*, 251 Ala. 250, 253, 37 So.2d 118, 120 (1948), *quoting Reed v. Real Detective Publishing Co.*, 63 Ariz. 294, 162 P.2d 133, 138 (1945). This public interest privilege is mandated by the First Amendment to the United States Constitution, and is not limited to "political expression or comment upon public affairs," but " 'freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which any information is needed or appropriate to enable the members of society to cope with the exigencies of their period.' " *Time, Inc. v. Hill*, 385 U.S. 374, 388, 87 S.Ct. 534, 542, 17 L.Ed.2d 456 (1967), *quoting Thornhill v. State of Alabama*, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1940).

■ The court finds that the present case falls within this privilege in that it is "in connection with the life of a person in whom the public has a rightful interest"[2] and "of public benefit." No mention is made of plaintiff before she met Joe or after her divorce. References to her, including indications of marital discord and her physical abuse by Joe, are limited to those appropriate to the account of Joe's decline from dependence on drugs and the efforts of Will and plaintiff to help him. There is no "morbid and sensational prying into [plaintiff's life] for its own sake." *Virgil v. Time, Inc.*, 527 F.2d 1122 (9th Cir. 1975), *cert. denied*, 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 823 (1976).

The story of a pharmacist's addiction to drugs from his pharmacy shelves might alone justify an intrusion into his wife's anonymity. This story has an additional source of reader interest. The author and central character is himself a "person in whom the public has a rightful interest." An account of the author's close association with his older brother is certainly appropriate to the autobiography, and plaintiff, the brother's wife, is subjected only to reasonable publicity in connection with that account.

Plaintiff argues that while Will Campbell may be a "person in whom the public has a rightful interest," she was not associated with his claim to notoriety, civil rights, and the fact that she was his sister-in-law is "too gossamer" to justify her inclusion in

**2.** The recent Supreme Court cases of *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979) and *Wolston v. Reader's Digest Assoc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979), are not considered by the court to be relevant to this determination. They relate to the definition of "public figure" in libel actions.

the book. The fact that she was the wife of a close and influential family member of the author's justifies her inclusion in the book. Joe's problems with drugs and the profound effect that had on the author justify the extent of her inclusion. The claims for invasion of privacy are, therefore, due to be dismissed.

An order in conformity with this memorandum of opinion will be entered separately.