This is an appeal from a judgment for the defendants based upon a jury verdict in an action arising out of a real estate commission contract. We affirm.
Plaintiff, G.D. Webb, d/b/a Webb Real Estate and Sales Agency, brought this action against Billy R. Renfrow; Virginia Renfrow; Romey L. Renfrow; Gladys B. Renfrow; C.B. International, Inc., a corporation; and Southeast Pizza Huts, Inc., a corporation. He sought several forms of relief: the unpaid proceeds from a real estate commission agreement which was a part of a ground lease, money damages for work and labor done as broker for the Renfrows, punitive damages against all defendants for fraud and conspiracy to defraud him of his broker's commission, and a mandatory injunction ordering the corporate defendants to pay the rental payments directly to him for deduction of his commissions and forwarding of the balances to the lessors Renfrow.
By their answer, the Renfrows contended, inter alia, that plaintiff was not entitled to any damages or proceeds. Southeast Pizza Huts (Southeast) and C.B. International denied any liability.
Summary judgment motions of the Renfrows, Southeast, and C.B. International were denied. Jury trial ensued. After plaintiff and the Renfrows had introduced evidence, the two corporate defendants moved for a directed verdict. Following arguments, the trial court granted the motion for a direct verdict against the plaintiff's claims on fraud and conspiracy. Ultimately, the jury returned a verdict in favor of all the defendants and plaintiff appealed.
The only issue presented to us is whether or not the trial court erred in directing the verdict in favor of C.B. International and Southeast on the conspiracy to defraud and fraud claims. *Page 726 
C.B. International is a management company which owns Southeast. The latter corporation is engaged in the day-to-day operation of Pizza Hut restaurants.
The action was an outgrowth of a business relationship between plaintiff and Gordon Elliott, president of C.B. International. Elliott is also president of Southeast. At plaintiff's motivation, plaintiff showed Elliott some potential sites for Pizza Huts in Jefferson County, and, as a result, Elliott became interested in real estate lots located in Gardendale, Leeds, and Hueytown. C.B. International eventually purchased a Hueytown tract and obtained leases for lots in Leeds and Gardendale. Plaintiff was the brokering agent in the transactions. The Gardendale tract is the one involved here.
Plaintiff secured a ground lease listing for the Gardendale property from its owners, the Renfrows. Negotiations between plaintiff and Elliott resulted in Elliott's tendering a proposed lease to plaintiff for submission to the lessors Renfrow. Elliott's letter to plaintiff explained one of the contingencies contained in the proposed lease concerning the existence of a sewer line:
 "The sewer line is of course all important because the building could be complete and just sitting there waiting for sewer connection. We would not want to pay the cost of building plus the cost of rent for a business that can't open because of the location of the property."
The tendered lease contained the following provision:
 "In the event the building permit cannot be secured on account of sewer lines not being in, or ground not passing percolation test, then this lease is null and void."
This lease was executed by Elliott for C.B. International and by the Renfrows on April 11, 1978. Attached to the lease was a commission agreement providing for rental payments of $550.00 monthly, payable to Webb Real Estate Agency for its deduction of $50.00 brokerage commission and forwarding of the $500.00 balance to the Renfrows. A bank check for $100 as earnest money, drawn by C.B. International, was delivered by plaintiff to the Renfrows.
It appears that in fact at the time of the lease no sewer line existed to service a building on the Gardendale lot. The Jefferson County public works department had surveyed the area in 1977 and initiated a sewer design, on paper, in April 1978. This design was completed in April 1980. Bids were taken, and work ultimately commenced on December 1, 1980. The sewer line was completed and accepted on August 28, 1981.
The record is unclear as to the exact time when funds were encumbered for beginning the sewer line, but it is clear that, for a year after the lease was executed and for some time thereafter, no sewer line existed to service the lot in question. It is also established that the Renfrows and C.B. International treated the lease as terminated because of the lack of sewer connection, with the result that the Renfrows returned the earnest money deposit to Elliott at his office in Kansas in August 1979. Thereafter, the Renfrows rented the lot to a mobile home dealer and later, sometime in 1980, placed a large wooden sign on the lot: "Commercial Property For Lease." After that, the Renfrows were in contact with a number of prospective tenants. However, the record does not disclose that the Renfrows initiated any contact with C.B. International or Elliott, or vice versa, after the return of the earnest money in 1979.
The controversy before us apparently springs from a new and separate lease of the lot in question made on June 3, 1981. This lease was executed between the Renfrows as lessors and Southeast. Mr. Tom Hrabovsky, a vice-president of Southeast, with offices in Birmingham, was in charge of Pizza Hut operations in Alabama, including new construction. He and one of his area managers, Dan Martin, noticed the sign on the lot, and Martin telephoned the number given on the sign. After that contact with the Renfrows, Hrabovsky began negotiating with the Renfrows concerning a lease of the property. Hrabovsky was *Page 727 
living in Memphis in 1978 and became area manager of Alabama in 1980. He testified that he did not know of the 1978 lease until this lawsuit was brought in 1982. Meanwhile, the sewer line was nearing completion. Hrabovsky negotiated a rent of $8,400.00 per year for the property, and obtained a lease from the Renfrows on those terms. The lease itself was executed on a form furnished by the home office of Southeast located at Pittsburgh, Kansas. That location is also the home office of C.B. International. In fact, the 1981 lease, while executed between the Renfrows and Southeast, bore at its head the title: "C.B. International, Inc., Ground Lease," and was executed by Gordon Elliott, as president of Southeast.
There is little doubt from the record that a close operating relationship existed between C.B. International and Southeast. Hrabovsky himself had been employed by C.B. International as early as 1976, and began employment with Southeast when the corporate structure was changed in 1978. The building permit for the structure, issued on August 11, 1981, was issued to "C.B. International." The customer response cards located in this Pizza Hut are addressed to "C.B. International." And it was brought out that both Elliott (who had negotiated the 1978 lease) and Hrabovsky had visited the site in 1981 prior to the time the 1981 lease was made. A "renewal" beer license for the Gardendale premises was issued in the name of C.B. International, Inc., by the Alabama Alcoholic Beverage Control Board in June 1981.
It bears repeating that the issue before us is not whether there was a breach of contract to pay a real estate commission, or whether Webb is entitled to recover damages for work and labor. Those issues were resolved by the jury adversely to plaintiff, and he has not made them an issue here. The only question before us is whether or not the trial court erred in granting the corporate defendants a directed verdict on the issues of fraud and conspiracy to defraud, i.e. whether there was any evidence of either or both requiring submission to the jury.
Actionable fraud in Alabama consists of (1) a false representation, (2) concerning a material existing fact, (3) reliance by plaintiff upon that false representation, and (4) damage to plaintiff as a proximate result. Code of 1975, §6-5-101; International Resorts, Inc. v. Lambert, 350 So.2d 391
(Ala. 1977). Fraud may also be committed by the suppression of a material fact which the party is under an obligation to communicate, either because of an obligation to communicate arising from a confidential relationship or from the particular circumstances. Code of 1975, § 6-5-102; Jim Short Ford Sales,Inc. v. Washington, 384 So.2d 83 (Ala. 1980). A civil conspiracy is a combination between two or more persons to accomplish by concert an unlawful purpose or to accomplish by unlawful means a purpose not itself unlawful. Barber v.Stephenson, 260 Ala. 151, 69 So.2d 251 (1954). The wrong committed is the gist of the action. Snyder v. Faget, 295 Ala. 197, 326 So.2d 113 (1976).
Plaintiff maintains that there was some evidence of a conspiracy existing between the defendants to defraud Webb of his broker's commission. This evidence, he argues, is furnished by the memorandum of lease for recording purposes. That document was an agreement between the Renfrows and C.B. International, executed by Gordon Elliott on behalf of C.B. International. This agreement, according to plaintiff, creates an inference of a conspiracy to defraud the broker. Additionally, plaintiff points to the similarity of the 1981 lease with the 1978 lease. Except for the amount of the rental payments and the deletion of the commission agreement, plaintiff argues, the leases are substantially the same, and thus, he says, there is an inference that the parties conspired to make it appear that a third party executed the 1981 lease and not the party procured by Webb, the plaintiff. To conclude otherwise, says plaintiff, was contra to the authority of Footev. Moore, 342 So.2d 906 (Ala. 1977), and Robbins v. Crawford,438 So.2d 759 (Ala. 1983). *Page 728 
We agree with the defendants that the facts in the instant case are distinguishable materially from those in the two cited cases.
In Foote, supra, the owners of the property listed for sale claimed that the commission contract with the broker had terminated before they effected a sale of the property to the buyer. The evidence, however, showed that the owners had continued negotiations with the same prospects introduced to them by the broker, and that the terms of the ultimate purchase and sale were substantially those initially discussed between the parties before the commission agreement had expired. This Court stated that a jury could have found that the parties were negotiating the sale while seller and broker were disputing the contract, and that therefore the sellers were guilty of bad faith. In the instant case, however, there was no evidence of continued negotiations in the interval between termination of the 1978 lease, which contained the "null and void" clause referring to sewer lines and percolation tests, and the execution of the 1981 lease.
Similarly, in Robbins, supra, the original sales contract between the seller on the one hand, and the buyers who were furnished by the broker, on the other hand, had terminated because the purchasers had conditioned their purchase upon the sale of their own property, and no such sale had occurred. The father of one of the buyers subsequently contracted to purchase the property, but on the day of closing the original purchasers bought the property "at the last minute." The evidence disclosed that the ultimate purchase price was approximately equal to the price originally agreed upon, less the real estate commission, and, moreover, following the sale, the seller became the purchaser's employee. There was also evidence from which the jury could have found that the purchasers had become financially able to buy the property because a prospect of their own had put up a binder. This evidence presented a conflict for the jury's resolution. Both of those cases were controlled by the following rule as stated in the jury charge from Foote, supra, 342 So.2d at 909:
 "A broker who procures a prospect who is ready, willing and able to buy under the terms of the contract during the existence of the contract, is entitled to his commission, although the sale may not have been concluded during the term of the contract. However, the seller is not bound forever by the contract. And unless the broker has procured a purchaser who is ready, willing and able to buy under the terms of the contract and during the existence of the contract, or unless the sellers were guilty of bad faith or guilty of fraud in their subsequent negotiations with the broker's prospect, the broker would not be able to recover."
In this case, the claim of fraud fails for at least two reasons. For one reason, Webb has failed to identify any false representation of a material fact made to him by either of the defendants. Section 6-5-101, supra. For another, Webb has not shown that he acted in reliance upon any such misrepresentation. Indeed, he himself testified that he did nothing more in connection with leasing the Renfrows' property after he mailed the 1978 lease to C.B. International. Moreover, no suppression of material fact occurred in this case, §6-5-102; nothing was shown to have required communication, nor was there established any confidential relationship between Webb and the Renfrows, or between Webb and Pizza Hut or C.B. International. Mr. Webb himself testified that his contract was with the Renfrows and that his commission was to come from them. That arrangement, for aught that appears from the record, was an arm's-length transaction.
Evidence of a conspiracy between Pizza Hut and C.B. International, or either or both, with the Renfrows is equally lacking. Webb concludes that conspiracy is shown by the fact that Elliott executed the 1978 lease as president of C.B. International and the 1981 lease as president of Pizza Huts, as if to disguise the 1981 transaction *Page 729 
as being between parties different from those in the 1978 lease. But both lease forms are identical. Both contemplated building a Pizza Hut. The 1981 lease's lessee, Pizza Huts, actually operated a Pizza Hut. Gordon Elliott executed the 1981 lease for Pizza Huts. Clearly, there can be no reasonable inference of disguise or concealment of the identity of the parties, nor any reasonable inference of illegal means or purpose in the conduct of Pizza Huts or C.B. International. Speculations of misconduct fall short of proof thereof. Nor did the Renfrows conceal anything from Webb. They, like C.B. International, treated the 1978 lease as "null and void" in 1979 when there was no sewer line nor any assurance of when one would be connected. Indeed, it would have been to the advantage of both Pizza Huts and C.B. International to maintain the 1978 lease, because both the rent and the commission would have been substantially lower. Instead, however, the Renfrows and C.B. International terminated the lease, and the Renfrows publicly advertised the property and rented it to others. No reasonable inference of concealment upon either side was established.
Finally, no evidence was adduced to dispute the testimony of Hrabovsky, whose contact with the Renfrows derived from noticing the sign placed by the Renfrows upon the lot. According to the record, Hrabovksy did not know of the 1978 lease. In short, plaintiff has not shown any fraudulent purpose on the part of Pizza Hut or C.B. International to interfere with or prevent Webb's operations on the terms under which he was to be paid a commission. Cf. Dancy v. Baker, 206 Ala. 236,89 So. 590 (1921).
Because we have found that the trial court did not err in granting the directed verdict in favor of the corporate defendants, the order of the trial court must be, and it hereby is, affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, JONES and SHORES, JJ., concur.