544 So.2d 875 (1989)
Travis H. McCAIG and Roy McCaig
v.
TALLADEGA PUBLISHING COMPANY, INC., et al.
87-156.
Supreme Court of Alabama.
March 10, 1989.
Rehearing Denied May 5, 1989.
*876 B. Greg Wood of Wood, Hollingsworth & Willis, Talladega, for appellants.
W.J. McDaniel and Robert S.W. Given of McDaniel, Hall, Conerly & Lusk, Birmingham, for appellee Talladega Pub. Co.
Craig S. Dillard of Wooten, Thornton, Carpenter, O'Brien & Lazenby, Talladega, for appellees Joe H. Mitchell and W.W. Gaddie.
PER CURIAM.
Travis H. and Roy McCaig appeal from a summary judgment in favor of the defendants, Talladega Publishing Company, Inc., Joe Mitchell, and W.W. Gaddie, in an action for libel and slander, trespass, and violation of the right of privacy. We affirm.
On Wednesday, February 12, 1986, the following article appeared in the Daily Home, a newspaper of general circulation published by defendant Talladega Publishing Company:
"CVEC BOARD OFFICERS CHECK METERS, FIND `IRREGULARITIES'
"Checking out confidential tips, two Coosa Valley Co-op Board officers inspected meters at several motels, trailer parks and other businesses Tuesday.
"Board Chairman Joe Mitchell of Talladega and Vice Chairman W.W. Gaddie of Cropwell said they had received reports from Co-op members who said `we needed to check out some things that were going on.'
"Mitchell took a week of his vacation time this week, he said, `to dig into some of the things I've been hearing,' and to work on arrangements for a fair election Saturday.
"Board members Jim Benefield and Nancy Clark were also involved in `doing some checking.'
"Mitchell and Gaddie said they found a number of `irregularities' and violations of Board policies. They were accompanied by Leland Fuller, Co-op general manager; Gary Wyatt and Howard Cooley, Co-op employees.
"Mitchell and Gaddie said a meter without a seal on it was found at the `old' McCaig Motel on Highway 78 near Embry's Crossroads.
"According to the Co-op's computer, the meter (No. 38 507 985) was not listed as being in active service.
"Mitchell and Gaddie said a Co-op work order dated Nov. 28, 1983, showed the meter to be a `floating meter.' They said there is or should be no such thing as a `floating meter' recognized officially by the Co-op.
"Records dug out of old files showed the meter to have been used at a `yellow house' at one time and at an `old white house' another time.
"Inspection of two meters at McCaig's Motel and the adjoining restaurant at Embry's Crossroads and Interstate 20 determined they were residential instead of commercial, according to Mitchell and Gaddie. Commerical rates are higher than residential rates.
"They said the residential meters resulted in an undercharge of $6,640.45 *877 over the past 13 months. They said the two businesses involved (motel and restaurant) would be required to pay the shortage.
"Frank's Restaurant near Embry's Crossroads was also found to have a residential meter, Mitchell and Gaddie said, with electricity billed at the preferential `Lincoln rate.'
"Mitchell and Gaddie said they had contacted M.R. Kirkland of Childersburg, chairman of the `Save Our Co-op' campaign, and that Kirkland admitted he once had a `floating meter' for use at his mobile home park. They said Kirkland told them he had received meter deposits but had turned all the money in to the Co-op.
"Mitchell and Gaddie said they had a meeting scheduled with Kirkland Tuesday but that his wife called and cancelled it. They (Mitchell and Gaddie) said they had no desire to hurt or embarrass Kirkland but they felt that members were entitled to all information pertaining to the Co-op.
"Another meter listed as residential was found at Handy Corner on Stemley Bridge Road. According to Co-op records, the meter was changed to the residential rates on Oct. 4, 1984.
"Members of the McCaig family, along with Kirkland, have been spearheading the `Save Our Co-op' campaign locally, joined by AEC, REA, AREA, and others from Montgomery, Andalusia, and Washington."
On April 18, 1986, the plaintiffs, Travis McCaig and Roy McCaig, filed a complaint that named as defendants Talladega Publishing Company, Joe Mitchell, and W.W. Gaddie. The complaint alleged libel and slander, trespass, and violation of the appellants' privacy rights. The trial court entered summary judgment in favor of the defendants on all claims, basing its judgment on the pleadings, eight depositions, and the written briefs and oral arguments of the parties. This appeal followed.

I. The Libel and Slander Claims

"`In actions for damages for libel or slander, as in other civil actions, it is [a] well settled general rule that it is the province of the [trial] court to state the law and that of the jury to determine the facts. Where different conclusions may be reasonably drawn by different minds from the same evidence, the question, ordinarily, is one for the jury. But where the facts are wholly undisputed and admit of no conflicting inferences, the question is one of law.' [Citations omitted.]"
Alabama Ride Co. v. Vance, 235 Ala. 263, 266, 178 So. 438, 440 (1938). See, also, American Benefit Life Insurance Co. v. McIntyre, 375 So.2d 239 (Ala.1979).
The elements of a cause of action for defamation are: 1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence on the part of the defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement. Restatement (2d) of Torts § 558 (1977).
The disposition of this appeal depends upon the resolution of issues that arise from the basic elements of defamation: 1) Were the statements contained in the Daily Home article false? and 2), if false, a) were those statements reasonably capable of being understood as defamatory? and b) were those statements intended by the publisher and understood by the recipients as defamatory?
Our review of the defamation issue, in a summary judgment context, is guided by First Amendment considerations that limit restraint of free speech. Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Thus, the applicable standard of review consists of a combination of factual issues for the jury's determination under a preponderance of the evidence standard, and legal issues for the court's determination. Once the movants' (the defendants') evidence in support of summary judgment shifts the burden of proof, the plaintiffs must meet that requisite burden with respect to all three of the *878 contested elements to withstand the motion.
With respect to the element of falsity, if the plaintiffs survive the summary judgment motion, the issue is a factual one for the jury's determination. Given the falsity element, these plaintiffs can survive a summary judgment motion only if the evidence meets a two-step test with respect to the issue of defamation: first, whether the false statements were capable of being understood as defamatory is a question of law for the trial court's determination; and second, given the falsity and defamatory meaning elements, whether those statements were intended by the publisher and understood by the recipients as defamatory (assuming the plaintiffs survive summary judgment) are questions of fact for the jury.
The plaintiffs contend that the evidence before the trial courtthe newspaper article in the context of the facts supplied by the depositions of the parties and other witnesseswas sufficient to provide a genuine issue as to whether certain of the statements in the Daily Home article were false; and, assuming their falsity, the plaintiffs contend that the trial court was authorized to determine that the false statements were capable of a defamatory meaning, in turn authorizing the jury to find that such statements were intended by the defendants as defamatory and were perceived as defamatory to the plaintiffs by the readers of the publication.
We, therefore, begin our review of the undisputed facts, as set out in the record, to determine whether the statements published in the Daily Home article were false.
Joe Mitchell, W.W. Gaddie, and other employees of the Coosa Valley Electric Cooperative (hereinafter "Co-op") state in deposition testimony that on February 10, 1986, they reviewed numerous Co-op accounts based on confidential reports they had received. Joe Mitchell testified that he took vacation time to check into these allegations. Both Mr. Mitchell and Mr. Gaddie testified that they relayed their findings to Daily Home editor Jay Thornton and advised him that certain anomalies existed in some of the Co-op accounts.
It is undisputed that Mr. Mitchell and Mr. Gaddie found a meter without a seal on it at the old McCaig Motel on Highway 78 near Embry's Crossroad. Plaintiffs Roy and Travis McCaig admit that they possessed a floating meter. (The term "floating meter" is used by the parties to represent a meter that is moved about from one location to another without an express order having been issued by the Co-op each time the meter is moved.) Billing supervisor Pauline Bowen, manager Leland Fuller, Mr. Mitchell, and Mr. Gaddie all state that when the meter number found on the floating meter at the McCaig Motel was punched into the Co-op computer on February 10, 1986, it was not listed as being in active service. All parties, including the McCaigs, state that a Co-op work order indicates that the floating meter was used at a yellow house at one time and at an old white house at another time. All parties admit that no written policies promulgated by the Co-op exist that authorize the use of a floating meter and that, at that time, on February 10, 1986, the only floating meter known to be in use was the one in the possession of Travis McCaig. Moreover, Ms. Bowen and Mr. Fuller testified that at no time, either before or after this incident, have individuals been allowed to apply for the use of a floating meter.
Ms. Bowen further testified that the meters found at the McCaig Motel and the adjoining restaurant at Embry's Crossroad were billed as residences rather than as commercial sites. Ms. Bowen, Mr. Mitchell, Mr. Gaddie, and Mr. Thornton all testified that Ms. Bowen prepared figures that reflected the difference in charging the McCaigs' property a residential rate as opposed to a commercial rate for electrical services. Finally, both Roy and Travis McCaig admit that they participated in the "Save Our Co-op" campaign.
It is clear from a review of the article published in the Daily Home that the defendants never accused Roy or Travis McCaig of stealing any electricity or of being guilty of any fraud. The undisputed *879 testimony of the parties indicates that facts set out in the article are in their most literal sense true. Given the truthfulness of the published statements, the trial court correctly determined that the statements, as a matter of law, were not capable of having a defamatory meaning, the first prong of the test of defamation. Because truth is always an absolute defense to any action for libel or slander, this court must affirm the trial court's summary judgment as to the McCaigs' defamation claim. Kirkpatrick v. Journal Publishing Co., 210 Ala. 10, 97 So. 58 (1923); Foley v. State Farm Fire & Casualty Insurance Co., 491 So.2d 934 (1986).
Further, while the McCaigs allege that the defendants entered into a conspiracy to libel the plaintiffs, a civil conspiracy is defined as a combination between two or more persons to accomplish an unlawful purpose or to accomplish, by any unlawful means, a purpose not itself unlawful. Webb v. Renfrow, 453 So.2d 724 (Ala.1984). Because the statements made by the defendants were not defamatory in nature, the conspiracy claim, too, must fail since there is no underlying actionable wrong to support the conspiracy theory. See, Tapscott v. Fowler, 437 So.2d 116 (Ala.1983). We, therefore, affirm the trial court's summary judgment as to the conspiracy claim.

II. The Trespass Claim

The McCaigs allege in their complaint that Mr. Mitchell and Mr. Gaddie unlawfully and maliciously trespassed upon real property within the plaintiffs' actual or constructive possession. The trial court entered summary judgment for the defendants as to this claim. We affirm.
There is no question that Mr. Mitchell and Mr. Gaddie entered upon the McCaigs' property to inspect the electrical equipment located there. Nevertheless, "[a]s an application of the general rule that one may not maintain an action for a wrong to which he has consented, consent or license may be a defense to an action of trespass," and "[c]onsent may be implied from custom, usage or conduct." 75 Am. Jur.2d Trespass § 41 (1974). Consent is a defense to an action for damages for trespass. Bobo v. Young, 258 Ala. 222, 61 So.2d 814 (1952).
It is undisputed that the meter, pole, meter socket, and other equipment presently on the McCaigs' land belong to Coosa Valley Electrical Cooperative and remain its property. The record in this case contains Policy Bulletin R-9, an official cooperative policy adopted by its duly elected board of trustees in 1978. That policy reserves for the cooperative's employees or authorized agents a right of access to customers' premises for the purpose of reading meters, testing, repairing, removing or replacing, or exchanging any or all of the equipment belonging to the Co-op. Thus, by accepting electrical services from Coosa Valley as a member of the cooperative, the McCaigs, by implication, accepted the policies of Coosa Valley and thereby granted the Co-op's agents and representatives a right of access for the limited purpose of inspecting and servicing the Co-op's equipment.
It is also factually undisputed that Mr. Mitchell and Mr. Gaddie were members of the Co-op's board of trustees. Therefore, their investigation of the equipment located on the McCaigs' property appears to have been conducted in their capacity as officers of the cooperative. Because the McCaigs granted the Co-op's agents and representatives a license to enter upon their land, and because Mr. Mitchell and Mr. Gaddie were representatives of Coosa Valley, we affirm the summary judgment on the trespass claim.

III. The Invasion of Privacy Claim

The McCaigs also allege in their complaint that the defendants unlawfully violated their right of privacy by publicizing their private business affairs. The trial court entered summary judgment for the defendants on this claim as well.
This Court has held that the right to privacy does not prohibit the broadcast of matter that is of legitimate public or general interest. Smith v. Doss, 251 Ala. 250, 37 So.2d 118 (1948). This concept is based upon the rationale that a right of action for invasion of privacy must give way to the *880 interest of the public in being informed. Daily Times Democrat v. Graham, 276 Ala. 380, 162 So.2d 474 (1964).
The record makes clear that in 1986, and for several preceding years, considerable controversy existed over the operation and administration of Coosa Valley Electric Co-operative, Inc. A reporter for the Daily Home, Paul Dale, testified that he had written articles that consistently covered this debate. At the time the article the subject of this suit was written, the Co-op's membership had scheduled a vote on the question of whether to dissolve the association. Moreover, for months prior to the vote, the Daily Home had printed editorials, stories, and letters to the editor relating to the issue, and it continued to do so for months afterwards. Finally, plaintiff Travis McCaig acknowledged in his deposition that the dispute over management of the cooperative was a matter of public concern, at the least, for the members of the cooperative.
The undisputed facts indicate that the purpose of the Daily Home article was to draw attention to mismanagement by the Co-op's administrators, a matter in which the community had a legitimate interest. The record reflects that all members of the Co-op had an interest in all phases of the Co-op's existence and that the matter clearly falls within the definition of "public concern." See, Campbell v. Seabury Press, 486 F.Supp. 298 (N.D.Ala.1979), aff'd, 614 F.2d 395 (5th Cir.1980). For this reason, the trial court's judgment regarding the invasion of privacy claim is affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, SHORES, ADAMS, HOUSTON and STEAGALL, JJ., concur.
JONES, J., dissents.
JONES, Justice (dissenting).
I respectfully dissent.
I am in complete agreement with that portion of the majority opinion that sets out the requirements for a cause of action for defamation. Applying that law to the instant facts, however, I reach a result contrary to that reached by the majority.
The plaintiffs contend, and I agree, that the evidence before the trial courtthe newspaper article and the depositions of the parties and other witnesseswas sufficient to provide a genuine issue whether certain of the statements in the Daily Home article were false; and, assuming their falsity, to authorize the trial court to determine that the false statements were capable of a defamatory meaning, in turn authorizing the jury to find that such statements were intended by the defendants as defamatory and were perceived as defamatory to the plaintiffs by the readers of the publication.
"The first element in a cause of action in defamation is a false statement (Mead Corp. v. Hicks, 448 So.2d 308 (Ala.1983))," (Tidwell v. Winn-Dixie, Inc., 502 So.2d 747, 748 (Ala.1987)), determined here in the context of the law of summary judgments:
"On motion for summary judgment, the moving party, in demonstrating to the satisfaction of the trial court that there is an absence of a genuine issue of material fact, bears a heavy burden. The movant must negate the existence of any issue of material fact by showing that there is no evidence tending to support the non-movant's position. His case must also withstand scrutiny of the record in a light most favorable to the non-moving party. Ryan v. Charles Townsend Ford, Inc., 409 So.2d 784 (Ala. 1981). The weight of this burden is increased by the requirement that `[a]ll reasonable doubts concerning the existence of a genuine issue of fact must be resolved against the moving party.' Sadie v. Martin, 468 So.2d 162, 165 (Ala. 1985)."
Kenai Oil & Gas, Inc. v. Grace Petroleum Corp., 512 So.2d 1347, 1351 (Ala.1987). (Emphasis in original.) (It is understood, of course, that the "preponderance of the evidence" standard must be factored into the application of the summary judgment rule to actions for defamation on the issue of liability. Mead Corp. v. Hicks, supra.)
*881 I am convinced that a "scrutiny of the record in a light most favorable to [these plaintiffs]" supports a finding that the defendants did not demonstrate a total absence of disputed material facts on the issue of falsity of the allegedly defamatory statements. The Daily Home article begins by mentioning "confidential tips," "things that were going on," and digging into and checking into things that had been heard (all apparently with regard to the use of a "floating meter") in the same context as "arrangements for a fair election" (having to do with the local controversy of whether to maintain a co-op utility in that area and the efforts being made to lobby for support on both sides of that issuea situation unrelated to the use of a "floating meter").
The article describes the use of a "floating meter," names the plaintiffs as the users of that meter (and names another customer as a former user of a "floating meter"), and states that the meter was "not listed as being in active service." The article goes on to report that commercial rates charged by the co-op are higher than residential rates, and then states that "residential meters" were found at businesses belonging to the plaintiffs and "resulted in an undercharge of $6,640.45 over the past 13 months." These statements were followed by statements that described these same customers as prominent figures in the local "Save Our Co-op" campaign.
The record before the trial court also included the depositions of both plaintiffs, of the two individual defendants, of the editor of the Daily Home, of the reporter who helped the editor write the article, of the general manager of the CVEC, and of an employee of the billing department of the CVEC. The deposition testimony provided allegations of fact contrary to the statements made in the Daily Home article: 1) Travis McCaig had permission to use the "floating meter" and paid a bill for its service each month; 2) the plaintiffs and their lawyer met with the CVEC general manager after the "floating meter" had been seized and, when he had heard the plaintiffs' story and checked out the CVEC records, the general manager called defendants Mitchell and Gaddie at the newspaper office to try to stop the publication of the article; 3) Mitchell and Gaddie refused to stop the publication of the article; 4) CVEC records were in error regarding the serial number of the "floating meter," which accounted for the initial determination that that meter was not authorized for service; 5) CVEC assigns a customer a "commercial" or "residential" rate and then bills the customer according to that rate (and there are no "commercial" or "residential" meters); 6) the CVEC general manager and the CVEC billing employee found everything was "okay" with the "floating meter"; 7) all of the defendants supported the dissolution of the CVEC; 8) neither of the plaintiffs had taken an active part in the activities of the "Save Our Co-Op" group; 9) the defendant newspaper made no verification of the information supplied by the individual defendants, despite the fact that the editor knew some of the information was not entirely accurate; 10) the use of the "floating meter" was not an indication of wrongdoing on the part of the plaintiffs; 11) CVEC policy prohibits release of information regarding CVEC customers without approval of the full CVEC Boardwhich approval was not obtained by Mitchell and Gaddie before they met with the editor of the Daily Home; and 12) the "$6,640.25 undercharge" was not an accurate representation because the rate used to make the calculation was incorrect.
Viewing the evidence in a light most favorable to the plaintiffs, I am convinced that there was before the trial court evidence that raised genuine issues of material fact as to the falsity of the statements contained in the Daily Home article. The inquiry now becomes whether those statements, assuming their falsity, were defamatory. Again, contrary to the holding of the majority, I am convinced that the evidence amply supports an answer in the affirmative.
At trial, a determination of whether the statements complained of were defamatory requires a two-step process in which the court and the jury each bears responsibility *882 for one of the "steps." A summary of this analysis is found in Restatement (Second) of Torts § 614 (1977):
"§ 614. Determination of Meaning and Defamatory Character of Communication
"(1) The court determines
"(a) whether a communication is capable of bearing a particular meaning, and
"(b) whether that meaning is defamatory.
"(2) The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient."
See, also, Harris v. School Annual Publishing Co., 466 So.2d 963 (Ala.1985).
If the court answers question (1)(a) or (1)(b) in the negative, the inquiry ends, and judgment for the defendants would be proper. If, however, the court answers question (1)(a) and (b) in the affirmative, the plaintiff must still prove to the jury by a preponderance of the evidence that the statement was indeed understood as defamatory by the recipients of the publication.
Comment d to § 614 of the Restatement states that "[b]oth the judge and the jury, in performing their respective functions, take into account all the circumstances surrounding the communication complained of as defamatory." Therefore, I conclude that the trial judge incorrectly applied the law to the facts of this case in determining that the statements contained in the Daily Home article were not capable of a defamatory meaning. Indeed, one would be hard-pressed to perceive any newsworthiness or other purpose for publication if not to suggest to the reading public that these plaintiffs were engaged in a clandestine scheme to cheat the system.
Similarly, there was ample evidence before the trial court, under the "preponderance of the evidence" test, to provide a genuine issue of material fact as to whether the readers of the Daily Home article understood the statements therein to be defamatory to the plaintiffs. When those statements are tested in the context of 1) the entire article, 2) the atmosphere surrounding the CVEC, and 3) the deposition and affidavit testimony, the "natural and probable effect [of the article] on the mind of the average lay reader" is clearly within the class of activities proscribed as defamatory communications. McGraw v. Thomason, 265 Ala. 635, 639, 93 So.2d 741, 744 (1957).
The trial court had before it testimony regarding the defendants' involvement in the local controversy over the CVEC, as well as testimony that persons who read the article believed that plaintiff Travis McCaig was "the one who was stealing electricity." These "extrinsic" circumstances, which the factfinder is entitled to consider (see comment d, Restatement (Second) of Torts § 614 (1976)), are additional factual evidences of the defendants' failure to establish the absence of a genuine issue of material fact as to the understanding of the allegedly defamatory material by its recipients. See, also, Restatement (Second) of Torts § 559 (1976), cited with approval in Harris v. School Annual Publishing Co., supra.
Finally, I would point out that this Court, in Mead Corp. v. Hicks, supra, also adopted § 580B of the Restatement. That section reads:
"One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he
"(a) knows that the statement is false and that it defames the other,
"(b) acts in reckless disregard of these matters, or
"(c) acts negligently in failing to ascertain them."
These defendants, in support of their motion for summary judgment in the context of this case, must demonstrate the absence of a genuine issue of material fact as to their intent and as to the understanding of the readers of the allegedly defamatory statements. See Gray v. WALA-TV, 384 So.2d 1062 (Ala.1980). This they have failed to do.
*883 The minimum requirement for proving fault against a defendant in a defamation case is that the plaintiff "prove by a preponderance of the evidence that the defendant was negligent in making the statement." Mead Corp. v. Hicks, supra, at 313 (emphasis supplied). Here, in determining the fault of the defendants (the individual defendants who supplied the information to the newspaper, and the defendant newspaper that published the article based on the information), a jury should be allowed to "take into account the thoroughness of the check that a reasonable person would make before publishing the statement, the nature of the interests that the defendant was seeking to promote in publishing the statement, and the extent of damage to which the statement exposed the plaintiff's reputation." Mead Corp. v. Hicks, supra, at 312. The evidence suggests that the defendants intentionally failed to make a thorough check of the truth or falsity of the allegations and insinuations made by the statements in the Daily Home article, even after the CVEC general manager made a telephone call to the editor's office to warn the defendants that the information about the plaintiffs was not correct.
Given the record before this Court on appeal, I can not say that the plaintiffs would be unable to sustain an action for defamation, including proof of liability on the part of these defendants, as well as the requisite proof, by clear and convincing evidence, in support of their claims for damages. See, for example, Beneficial Management Corp. v. Evans, 421 So.2d 92 (Ala.1982); Gray v. WALA-TV, supra; Mobile Press Register, Inc. v. Faulkner, 372 So.2d 1282 (Ala.1979); and Loveless v. Graddick, 295 Ala. 142, 325 So.2d 137 (1975).
It is my opinion that the trial court erred in granting the defendants' motion for summary judgment and that the judgment appealed from should be reversed and the cause remanded.