ADAMS, Justice.
Timo Haapanen, individually and as father and next friend of Timo Haapanen, a minor,[1] filed an action against Mid-South Insurance Co. (hereinafter “Mid-South”) and numerous other defendants, seeking to recover damages for conspiracy to defraud, breach of contract, and bad faith failure to pay an insurance claim. The trial court entered summary judgment on all claims in favor of Mid-South, and the plaintiffs appeal. We affirm as to the claim alleging *895 bad faith, reverse as to the claims alleging breach of contract and conspiracy to defraud, and remand.
I. Facts
Although most of the facts are in dispute, we were able to glean the following from the record: The complex facts of this case, which involves a series of transfers among several insurance companies, center around a group health insurance policy that was marketed and sold by The Liberty Group. R.L. Smith d/b/a The Liberty Group developed the policy along with several other “master plans” specifically for marketing to group associations. Milt Wilkinson of First Services Group as the third party administrator was responsible for the administration of the plans, which included the collection of premiums, medical underwriting, and recommendations as to premium increases.
When the policy was first marketed, Smith arranged for Continental Bankers[2] to underwrite the policy. However, in April 1984, Smith and First Services Group decided to change underwriters and Hermitage Health and Life Insurance Company (hereinafter “Hermitage”) became the new underwriter. At the time Hermitage became the new underwriter, Allen Ross was the president of Hermitage.
On June 1, 1985, Haapanen purchased a “Double Eagle II” group health insurance policy for his family through Charlotte S. Davey an insurance agent at Trammel, Harper & Williams. Haapanen’s policy was a Double Eagle master policy plan issued through a group known as the American Association of Consumer Awareness (hereinafter “AAOCA”). The policy provided a maximum lifetime benefit of $1,000,000 per person.
The AAOCA was one of three non-profit group associations through which the plans were marketed. The AAOCA and the United Services Association of America were located in the same building as the third party administrator, First Services Group, in Houston, Texas. The third group association, the American Businessman’s Worldwide Association was located in Phoenix, Arizona. The only requirements for membership in any of the three group associations were that any proposed insured be 18 years of age and be a “consumer.” In addition to the premium, every insured paid $15 annually for association dues.
In the spring of 1985, Hermitage advised Smith and the plan administrator, First Services Group, of its intention to cancel the Double Eagle group policies effective September 30, 1985, or when notified that a new carrier had been located.[3] Around the same time, Smith sold the Liberty Group’s interest to First Services Group. Thus, First Services Group became the owner as well as the plan administrator.
Wilkinson arranged for Keystone Life Insurance Company of Texas (hereinafter “Keystone”) to underwrite the Double Eagle business. Keystone became the new underwriter for the plans effective July 1, 1985.[4]
On May 10, 1986, Timo was involved in a serious automobile accident. He was in a coma for several months and currently requires constant medical care. He is permanently and totally disabled. Keystone began paying the claims that were made for benefits under the policy.
In the fall of 1986, Keystone made the decision to cancel some of the Double Eagle master policies in accordance with the 30 day cancellation provision of the policies.[5] On November 1, 1986, the president of Keystone wrote the AAOCA, the group through which Haapanen’s policy was issued, the following letter:
“This will serve as notice, as required by the Policy, that Master Policy No. KLDE-II-7/85-002 which was issued to *896 United Services Association of America [sic] by Keystone Life Insurance Company is being terminated by Keystone effective December 81, 1986.
“A 90-day extension of benefits will be provided for Covered Persons who are totally disabled on December 31, 1986, in accordance with the terms of the Master Policy.”
On November 25, 1986, the AAOCA notified Haapanen that the policy would be cancelled effective December 31, 1986. That letter stated in part:
“Please note that your coverage has an Extension of Benefits Provisions. If your premium is paid through December 31, 1986, and either you or one or more of your dependents is totally disabled as defined in a certificate booklet at midnight on December 31, 1986, coverage will continue for the condition causing the disability for ninety days after termination of coverage.”
Haapanen paid premiums for continued benefits for the 90-day extension. That extension of benefits was extended to six months, from December 31, 1986, to June 30, 1987, in accordance with Texas law. Haapanen testified that he actually paid premiums through September 1987.
However, on January 22, 1987, Keystone notified the plaintiffs by letter that the policy was being terminated:
“We have received the claim for the above named patient, however we are unable to assist you at this time.
“Our records indicate that your coverage terminated on the date shown below [December 31, 1986].
“We regret that we are unable to pay this claim, however, we must abide by policy provisions.”
On February 5, 1987, a vice-president of Keystone wrote to Haapanen. That letter stated in part:
“I am in receipt of your letter dated 1-7-87 and 1-16-87 along with your check number 4681 in the amount of $153.75.
“Please be advised that the Continuation Privilege of the policy has been granted in accordance with policy provisions.
“Through timely payment of monthly premiums in the amount of $146.75 to Keystone ... your coverage is extended through 6-30-87, at which time all benefits will terminate. Currently you have a $7.00 credit as on continuation, we discontinued the association dues and administrative fee. Therefore, you owe $139.75 for 2-1-87 premiums.”
Milt Wilkerson contacted Allen Ross at Mid-South about underwriting the Double Eagle plans administered and marketed by First Services Group. There was testimony from representatives at First Services Group that Ross was contacted because of the past relationship First Services had had with him while he was at Hermitage. First Services Group ultimately retained Mid-South as the new underwriter.
The original complaint in this case was filed on March 16, 1987, against Charlotte S. Davey, an agent of Trammel, Harper & Williams, as well as Trammel, Harper & Williams; Keystone; and Hermitage; alleging breach of contract, bad faith, and conspiracy to defraud. The plaintiffs ultimately amended the complaint several times and substituted numerous other defendants, including the third party administrator, First Services Group and its principals; Mid-South Insurance Company; Allen D. Ross; and the AAOCA. In addition to the claims alleging breach of contract, bad faith, and conspiracy to defraud, the plaintiffs added claims alleging negligent placement of insurance coverage, fraud and misrepresentation.
The particular theories against Mid-South, the only defendant made a party to this appeal, were breach of contract, bad faith, and conspiracy to defraud. The plaintiffs contend that Mid-South and Ross, now vice-president of Mid-South and former president of Hermitage, conspired with the other defendants to shift blocks of insurance business from one company to another and in the process, terminate the master group policy, slough off policies on which there were substantial claims, or which had the likelihood to be substantial claims, and shift the other blocks of insur- *897 anee to another group association with another company.
The trial court granted Mid-South’s motion for summary judgment on February 3, 1989. The summary judgment was made final pursuant to Rule 54(b) A.R.Civ.P., and the plaintiffs filed this appeal on March 6, 1989.
II. Summary Judgment
“The purpose of the motion for summary judgment is to test the sufficiency of the evidence to determine if any real issue exists.” Garrigan v. Hinton Beef & Provision Co., 425 So.2d 1091, 1093 (Ala.1983). “The party moving for summary judgment bears the heavy burden of clearly showing: (1) that there is no genuine issue as to any material fact; and (2) that because there is no factual controversy, the movant is entitled to a judgment as a matter of law.” Tripp v. Humana, Inc., 474 So.2d 88, 90 (Ala.1985); Rule 56(c), A.R. Civ.P. In other words, “[i]f there exists a mere gleam, glimmer, spark, the least bit, the smallest trace” of evidence or an inference therefrom that supports the plaintiffs’ claims, a summary judgment must be reversed.[6] Fountain v. Phillips, 404 So.2d 614, 618 (Ala.1981). Our review of the propriety of the summary judgment includes a review of all evidence of record, including that evidence formally submitted in support of, or in opposition to, Mid-South’s motion.
III. Bad Faith
This Court recognized the tort of bad faith failure to pay an insurance claim in Chavers v. National Security Fire & Casualty Co., 405 So.2d 1 (Ala.1981), and in that case set out the standard of proof that a plaintiff must meet in order to recover on a claim of bad faith:
“[A]n actionable tort arises for an insurer’s intentional refusal to settle a direct claim where there is either ‘(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal.’ ”
Chavers, 405 So.2d at 7.
In National Security Fire & Casualty Co. v. Bowen, 417 So.2d 179 (Ala.1982), the Court set forth the elements of the tort of bad faith in Alabama:
“(a) an insurance contract between the parties and a breach thereof by the defendant;
“(b) an intentional refusal to pay the insured’s claim;
“(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
“(d) the insurer’s actual knowledge of the absence of any legitimate or arguable reason;
“(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer’s intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.
“In short, plaintiff must go beyond a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for dispute. Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim.”
National Security, 417 So.2d at 183.
Mid-South argues that it never refused to pay a claim for payment of benefits to Haapanen because a claim was never actually submitted by Haapanen. Thus, Mid-South contends that the trial court properly entered summary judgment on the bad faith claim as a matter of law. We agree.
We have reviewed the record, including the depositions, affidavits and other documents, and cannot ascertain therefrom that Haapanen ever submitted a claim to Mid-South for payment of benefits or that Mid-South ever denied coverage. The only evidence relating to any claim or denial— and its authenticity is in dispute — is a letter dated August 18, 1987, from Allen Ross at *898 Mid-South in response to a letter written by Terry Raycraft, with the State Department of Insurance. That letter stated in part:
“According to our records, we issued a Master Group Policy to the American [Businesssmen’s] World Wide Association effective February 1, 1987, and issued a certificate of insurance to members of that association who were insured on January 31,1987 with the previous carrier. The records show that Mr. Timo Haapanen was not insured with the previous carrier on January 31, 1987, and therefore, has not been insured with Mid-South.”
The issue of the authenticity of the letter need not be addressed, because, even if the letter were considered, plaintiffs still have not introduced sufficient evidence to prove that a claim was made and Mid-South’s denial of that claim. We therefore affirm the summary judgment for Mid-South on plaintiffs’ bad faith claim.
IV. Breach of Contract and Conspiracy to Defraud
The plaintiffs contend that Mid-South and Ross, former president of Hermitage and now vice-president of Mid-South, conspired with the third-party administrator and with other defendants to defraud them. The plaintiffs contend that the defendants shifted blocks of insurance business from one company to another and, in the process, terminated the master group policy, sloughed off policies on which there were substantial claims or as to which there was the likelihood of substantial claims, and shifted the other blocks of insurance to another group association with another company.
Mid-South offered the testimony of Mary Damiani, a representative from the third party administrator, First Services Group, that Mid-South agreed only to underwrite the master policies that were in force and effect on January 31, 1987. However, that testimony also reveals the following:
“Q. And when Mid-South picked it up from Keystone, did they take the whole block of insurance?
“A. They took the block of business that was in force as of February 1st. “Q. Well, is Mr. Haapanen’s ‘Double Eagle’ coverage in force with Mid-South now?
“A. No.
“Q. Do you know why his coverage is not in force?
“A. His coverage was issued under a master policy that was terminated by Keystone on December 1st.
“Q. Well, I guess I’m not clear. If Mid-South picked up all the ‘Double Eagle’ coverage, and some of the ‘Double Eagle’ coverage had been cancelled by Keystone?”
“A. There were master policies issued. And people were issued certificates of coverage under those master policies. The policy that's now in evidence was cancelled by Keystone, and that is where Mr. Haapanen’s coverage — certificate had been issued was under that master policy. He, along with whoever else had coverage under that particular master policy, were terminated at the same time. “Q. The whole group?
“A. The whole group.
“Q. It wasn’t just him?
“A. No, it wasn’t just him. It was the whole group.
According to Ms. Damiani’s testimony and other evidence in the record, Haapanen’s policy was not the only policy that was cancelled, but the whole AAOCA group association’s “Double Eagle II” coverage was cancelled. However, the plaintiffs introduced evidence of Mid-South’s agent compensation schedule that revealed that its agents were receiving commissions for the “Double Eagle II” policies. There is also in the record other evidence of correspondence between representatives from Mid-South and First Services Group indicating that Mid-South had picked up the “Double Eagle II” policies.[7]
*899 The pleadings and the evidence of record, when viewed in the light most favorable to the nonmoving party, do not display a complete lack of any genuine issue of material fact. The evidence clearly presents many factual questions for a jury as to whether there was a breach of contract or whether Mid-South was involved in an alleged conspiracy. Therefore, the trial court erred in entering summary judgment for Mid-South on the conspiracy to defraud and breach of contract claims.
In summary, we affirm the summary judgment as to the bad faith claim. Because the plaintiffs have presented genuine issues of material fact on the breach of contract and conspiracy to defraud claims, the summary judgment is reversed as to those claims, and the cause is remanded to the trial court.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and ALMON, SHORES, HOUSTON, STEAGALL and KENNEDY, JJ., concur.
MADDOX, J., concurs specially.
JONES, J., concurs in part and dissents in part.

. Both the father and the son in this case are named Timo Haapanen. For clarification, we will refer to the son as “Timo," and to the father as "Haapanen.” The father is suing individually and on behalf of his minor son.

. Continental Bankers subsequently went into rehabilitation on July 17, 1986, and was liquidated.

. Hermitage was subsequently placed in rehabilitation on October 6, 1986, and was liquidated.

. At the time Keystone began to underwrite the Double Eagle business, it was not licensed in the State of Alabama.

. Keystone was placed in receivership on March 16, 1987, and is currently being liquidated.

. Because this action was filed prior to June 11, 1987, the "scintilla rule" and not the "substantial evidence rule” is the applicable standard. Ala. Code 1975, § 12-21-12.

. There is also some confusion presented in the correspondence in the record which would tend to support plaintiffs’ conspiracy theory that after certain policies were cancelled the remain *899 ing insureds would be moved from one group association to another. See, for instance, the letter from Keystone to the AAOCA, the group Haapanen was in; that letter states:
"This will serve as notice, as required by the Policy, that Master Policy No. KLDE-II-7/85-002 which was issued to United Services Association of America by Keystone Life Insurance Company is being terminated by Keystone effective December 31, 1986.”