COOK, Justice.
Timo Haapanen, individually and as father and next friend of his son, Timo Haapanen, a minor, appeals from summary judgments granted in favor of Emmett Godfrey, president of Underwriting Services of Alabama, Group Department; American Insurance Services Corporation; and George Bogle, individually and as president of American Insurance Services Corporation. Those summary judgments were against Haapanen’s claims alleging negligent or wanton placement of insurance coverage, conspiracy to defraud, and misrepresentation. We affirm.
Haapanen sued Charlotte Davey; Trammel, Harper & Williams, Inc.; Hermitage Life Insurance Company; Keystone Life Insurance Company; Mid-South Life Insurance Company (the company that acquired most of Keystone’s business when it went into receivership); George Bogle, individually and as president of American Insurance Services Corporation; American Insurance Services Corporation; Emmett Godfrey; The Liberty Group; Milt Wilkinson (president of The Liberty Group); and several other defendants not pertinent to this appeal. He alleged misrepresentation, wantonness, breach of contract, conspiracy to defraud, negligent placement of insurance, and bad faith failure to pay an insurance claim. The trial court entered a summary judgment in favor of Mid-South Life Insurance in 1989, and this Court affirmed that judgment with regard to the bad-faith-failure-to pay claim, but reversed it with regard to the claims of breach of contract and conspiracy to defraud. See Haapanen v. Mid-South Insurance Co., 564 So.2d 894 (Ala.1990). After several attempts to clarify the pleadings, the trial court then entered summary judgments in favor of George Bogle, American Insurance Services Corporation, and Emmett Godfrey on all counts against them. The other defendants settled with the plaintiff and are not parties to this appeal.

Facts

On May 10, 1986, young Timo Haapanen was involved in an automobile accident that rendered him severely physically and mentally disabled. He was insured under a group policy known as a Double Eagle II policy, which his father had purchased in July 1985. The father had purchased it through Charlotte Davey, an agent of Trammel, Harper & Williams, Inc. In order to purchase the group policy, Haapanen paid a $15.00 fee to join the American Association of Consumer Awareness. He paid that fee when he applied for coverage in the amount of $1,000,-000. Initially, Haapanen’s coverage was placed with Hermitage Health and Life Insurance Company; however, the Double Eagle II group policies issued by Hermitage were later moved to Keystone Life Insurance Company, which was not licensed to do business in Alabama. Timo’s accident occurred after the coverage had been moved to Keystone. Keystone paid Mr. Haapanen $400,-000 as a result of Timo’s accident but thereafter notified the father that it was terminat- *549 mg his coverage effective December 31,1986. Keystone further notified the father that, pursuant to the contract, coverage would continue for 90 days after notification for persons totally disabled. Although the insurance was ultimately extended for 6 months, the third-party administrator again moved coverage of the Double Eagle II policies to Mid-South Insurance, and that company became the new underwriter for policies in effect as of January 1, 1987. Mid-South considered the Haapanen insurance terminated as of December 31, 1986, despite the extension, and refused to continue it. See Haapanen v. Midr-South Insurance Co., 564 So.2d 894 (Ala.1990), for this Court’s rationale with regard to the Haapanens’ claims against Mid-South.
Because this action was filed before June 11, 1987, we must apply the scintilla rule in reviewing these summary judgments. Ala.Code 1975, § 12-21-12. In the earlier Haapanen appeal, we explained the scintilla rule in relation to a summary judgment motion:
“‘The purpose of the motion for summary judgment is to test the sufficiency of the evidence to determine if any real issue exists.’ Garrigan v. Hinton Beef & Provision Co., 425 So.2d 1091, 1093 (Ala.1983). ‘The party moving for summary judgment bears the heavy burden, of clearly showing: (1) that there is no genuine issue as to any material fact; and (2) that because there is no factual controversy, the movant is entitled to a judgment as a matter of law.’ Tripp v. Humana, Inc., 474 So.2d 88, 90 (Ala.1985); Rule 56(c), A.R.Civ.P. In other words, ‘[i]f there exists a mere gleam, glimmer, spark, the least bit, the smallest trace’ of evidence or an inference therefrom that supports the plaintiffs’ claims, a summary judgment must be reversed. (Footnote omitted).”
Haapanen v. Midr-South Insurance Co., supra, at 897.

Negligent or Wanton Placement of Insurance

The father contends that Bogle and Godfrey negligently or wantonly placed his insurance with Hermitage and/or Keystone. He contends that Bogle and Godfrey, through their marketing scheme, provided materials that ultimately resulted in his selection of Hermitage as his insurance carrier. He further argues that the representations made by Bogle and Godfrey to others in the marketing chain regarding the stability of Keystone caused him to remain with that company once it became the carrier for the Double Eagle II policies.
George Bogle is the president of American Insurance Services Corporation, a national marketer of insurance policies. In one of his affidavits offered in support of a motion for summary judgment, Bogle conceded that he and his agency were involved in the distribution of brochures and applications regarding the Double Eagle II policy that was ultimately sold to Mr. Haapanen. He stated that American Insurance Services Corporation distributed the materials to Emmett Godfrey of Underwriting Services, who in turn distributed materials for group health policies to licensed insurance agents. Trammell, Harper & Williams received this information, and Charlotte Davey of Trammell, Harper & Williams ultimately sold the insurance policy to Mr. Haapanen.
The evidence indicates that Bogle and Godfrey did not know Mr. Haapanen, and, although Bogle and Godfrey distributed applications and brochures regarding the Double Eagle II policies, there is no evidence that they were responsible for placing Mr. Haapanen’s insurance coverage with Hermitage. Charlotte Davey initially placed Mr. Haapanen’s coverage with Hermitage after Mr. Haapanen and Davey had reviewed several policies. Bogle and Godfrey distributed information on the Double Eagle II policy; however, they did not place Mr. Haapanen’s insurance and, therefore, cannot be liable to him for negligent or wanton placement of his insurance coverage with Hermitage.
With regard to Keystone, Bogle stated by an affidavit, which was undisputed, that he was not involved in the administrative decisions regarding the Double Eagle II coverage purchased by Haapanen. He further stated in a deposition, which was undisputed, that he was told about such administrative *550 changes as moving coverage from Hermitage to Keystone only after they had occurred.
Bogle and Godfrey point out that Hermitage was licensed by the commissioner of insurance to do business in Alabama and their deposition testimony supports their position that it was Hermitage and not Bogle or Godfrey who made the decision to terminate coverage of the Double Eagle II policies. In a letter to producing agents, the third-party administrator, The Liberty Group, stated the following on June 14, 1985:
“On May 22, 1985, The Liberty Group was advised by Hermitage Health and Life that they would no longer underwrite the Double Eagle association group plans after September 30, 1985.”
Although Bogle and Godfrey may have distributed information regarding Hermitage’s policies, Mr. Haapanen failed to offer even a scintilla of evidence that Bogle or Godfrey was involved in any way with the change in coverage from Hermitage to Keystone. It appears from the evidence that Hermitage terminated its coverage of the Double Eagle II policies. Thereafter, the third-party administrator decided to move the coverage to Keystone. Even if Bogle or Godfrey was responsible for marketing Hermitage or Keystone as an exceptional company while knowing of certain claims problems, Mr. Haapanen presented no evidence indicating that Bo-gle or Godfrey knew, before the change, that the third-party administrator would select Keystone to handle the Double Eagle II business. In fact, in the very same letter announcing that Keystone would be taking over the Double Eagle II coverage, The Liberty Group told the producing agents that several companies had inquired regarding taking over the Double Eagle II business.
“[W]e recognize that before liability for negligence can be imposed, there must first be a legal duty owed to the person injured or to a class of persons to which the plaintiff belongs, and a breach of that duty, proximately resulting in the injury. Hill v. Reaves, 224 Ala. 205, 206, 139 So. 263 (1932). The existence of a duty to the plaintiff is fundamental to a negligence claim. City of Bessemer v. Brantley, 258 Ala, 675, 681, 65 So.2d 160, 165 (1953).”
Graveman v. Wind Drift Owners’ Association, Inc., 607 So.2d 199, 203 (Ala.1992). See also Albert v. Hsu, 602 So.2d 895, 897 (Ala. 1992). Mr. Haapanen presented not even a scintilla of evidence to indicate a duty owed or a breach of a duty; therefore, he did not rebut the defendants’ prima facie showing in support of their summary judgment motions. The summary judgments for these defendants on the claims alleging negligent or wanton placement of insurance were appropriate.

Misrepresentation and Conspiracy to Defraud

Mr. Haapanen contends that Bogle and Godfrey knew or should have known that Hermitage and Keystone would be unable to support the Double Eagle II business because, he says, Hermitage was experiencing “horrendous” claims problems before he purchased his policy with Hermitage. He claims that had he known of these problems, he would have purchased insurance through another company or would have canceled his policy as soon as he learned of the financial situation. Mr. Haapanen also claims that these defendants conspired to defraud him by making representations they knew to be false; that those representations induced him into purchasing the Double Eagle II policy; and that these- defendants lulled him into a sense of false security after the policy was transferred to Keystone.
Mr. Haapanen makes much of the fact that Keystone, which was licensed in more states than Hermitage, was not licensed to do business in Alabama; however, his own experts concede that it was not illegal for Keystone to take over Hermitage’s existing business, as long as it did not create new business within Alabama before obtaining a license to do business here. Furthermore, evidence that Keystone was not licensed to do business in Alabama does not in itself indicate that Keystone was financially unstable when it took over coverage of the Double Eagle II policies, if there is no evidence that Keystone had applied for a license.
Mr. Haapanen offered no evidence tending to show that Bogle or Godfrey influenced the decision to move the Double Eagle II cover *551 age to Keystone or, for that matter, to Mid-South. Although Mr. Haapanen purchased the policy from Hermitage, it was Keystone that terminated Haapanen’s coverage, and it was Mid-South that refused to consider extending or continuing coverage after it replaced Keystone.
With regard to Haapanen’s conspiracy claim, we note the following rule:
“A conspiracy exists only when parties combine to accomplish an unlawful purpose or to accomplish a lawful purpose through unlawful means. McCaig v. Talladega Publishing Co., 544 So.2d 875 (Ala.1989). The conspiracy is not actionable if the plaintiff cannot prove a wrong committed through the conspiracy. Speculations of misconduct fall short of proof thereof. See Webb v. Renfrow, 453 So.2d 724 (Ala. 1984).”
Keller v. Security Federal Savings & Loan Ass’n, 555 So.2d 151, 155 (Ala.1989).
Mr. Haapanen offered not even a scintilla of evidence indicating that these two defendants conspired to defraud him. He offered no evidence of communications between them tending to indicate that they conspired to induce him to purchase his insurance with Hermitage. Furthermore, he presented no evidence of an underlying wrongful act for which Bogle, his company, and Godfrey would be liable. Because Mr. Haapanen failed to offer a scintilla of evidence indicating that Bogle or Godfrey should be held responsible for the loss of insurance on his son, the summary judgments in their favor were proper as to all counts.
AFFIRMED.
HORNSBY, C.J., and HOUSTON, STEAGALL and INGRAM, JJ., concur.