[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 74 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 75 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 76 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 77 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 78 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 79 
This Court originally affirmed the summary judgments of the trial court in the underlying case without an opinion. The decision to affirm the judgments of the trial court without an opinion was made because an opinion in this case would add little precedential value to the areas of the law discussed, and this Court concluded, after reviewing the record and the contentions of the parties, that the trial court's judgment was entered without error of law. See Rule 53(a)(1) and (a)(2)(F), Ala. R.App. P. In addition, because of the sensitive nature of the facts of this case, this Court did not want to subject the families involved to the further embarrassment and humiliation that might be brought about by a published opinion. However, counsel for the appellants strongly criticized this Court in the applications for rehearing filed in these appeals for failing to issue a published opinion; therefore, this Court has reconsidered its decision not to release a published opinion in this case, withdraws its no-opinion affirmance of June 9, 2006, and substitutes the following opinion therefor.[1]
B.B.[2] and S.B., individually and as parent and next friends of C.J.; P.C. and B.C., individually and as parents and next friends of E.C.; R.D. and S.D., individually and as parents and next friends of M.D.; and G.H. and L.H., individually and as parents and next friends of K.H. (sometimes collectively referred to as "the plaintiffs"), *Page 80 
sued Saint James School, its former headmaster John S. Bell, and Kevin Ketzler, the chairman of the board of directors of Saint James School (sometimes collectively referred to as "the Saint James defendants"), on August 16, 2001, alleging breach of contract, negligence, wantonness, invasion of privacy, the tort of outrage, and tortious interference with a contractual relationship.
The Saint James defendants answered the complaint on August 31, 2001, denying each count of the complaint and asserting certain affirmative defenses. The Saint James defendants also asserted a counter-claim pursuant to the Alabama Litigation Accountability Act, § 12-19-270 et seq., Ala. Code 1975.
On October 8, 2002, the plaintiffs amended their complaint to assert a claim of conversion and claims pursuant to42 U.S.C. §§ 1981 and 1983. On November 6, 2002, the Saint James defendants moved the trial court to dismiss the claims asserted in the amended complaint.
The plaintiffs sued D.Sk., M.G., and J.Si., on February 18, 2003, alleging negligence, bailment or conversion, fraud, and defamation. D.Sk. and J.Si. each moved the trial court to dismiss the plaintiffs' claims asserted against them.
On April 4, 2003, the plaintiffs moved the trial court to consolidate the two cases. The plaintiffs amended their complaint against D.Sk., M.G., and J.Si. on April 29, 2003, to assert a claim of invasion of privacy. J.Si. moved the trial court to dismiss the amended complaint. The trial court entered an order on May 15, 2003, consolidating the two cases under a single case number, stating that the cases "will be heard as one case before this Court." On that same date, the trial court entered an order dismissing the conversion claim against the Saint James defendants.
On November 13, 2003, the Saint James defendants moved the trial court for a summary judgment as to all remaining claims asserted against them by the plaintiffs. Following a hearing, the trial court, on May 24, 2004, entered a summary judgment in favor of the Saint James defendants as to all remaining claims asserted against them by the plaintiffs. On June 29, 2004, the trial court entered an order certifying its May 24, 2004, judgment as final pursuant to Rule 54(b), Ala. R. Civ. P. The plaintiffs filed their notice of appeal with this Court on July 2, 2004 (case no. 1031517).
On June 10, 2004, D.Sk. moved for a summary judgment as to all claims asserted against her by the plaintiffs. On August 12, 2004, the trial court ordered that J.Si.'s earlier filed motions to dismiss be treated as a motion for a summary judgment. J.Si. supplemented the motion on September 20, 2004. Following a hearing, the trial court, on November 18, 2004, entered a summary judgment in favor of D.Sk. and J.Si. as to all claims asserted against them by the plaintiffs and certified that judgment as final pursuant to Rule 54(b), Ala. R. Civ. P.[3]
The plaintiffs filed their notice of appeal with this Court on December 28, 2004 (case no. 1040486).[4] *Page 81 
In reviewing the disposition of a motion for a summary judgment, we use the same standard the trial court used in determining whether the evidence before it presented a genuine issue of material fact and whether the movant was entitled to a judgment as a matter of law. Bussey v. John Deere Co.,531 So.2d 860, 862 (Ala. 1988); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that no genuine issue of material fact exists, the burden then shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County,538 So.2d 794 (Ala. 1989). Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v.Founders Life Assurance Co. of Florida, 547 So.2d 870, 871
(Ala. 1989). This Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Manners v. Balfour Guthrie,Inc., 564 So.2d 412 (Ala. 1990).
 I. Facts Relevant to Both Appeals
Saint James School is a private school operated as a nonprofit organization and enjoys status as a tax-exempt entity under the Internal Revenue Code. At the time of the events giving rise to this action, Bell served as the school's headmaster; Ketzler served as an unpaid volunteer in the capacity of chairman of its board of directors; and C.J., E.C., M.D., and K.H. (collectively referred to as "the students") were four 14-year-old females enrolled in the ninth grade at Saint James School.
On New Year's Eve 2000 the students attended a party at the house of a fellow classmate. The party was not a school-sponsored event. While at the party the students participated in a card game called "Strip-Gotcha" with other attendees, including M.G. and J.Si., male classmates of the students. The card game requires that a person remove an article of clothing if that person loses at a hand of cards. During the game the students removed various articles of jewelry and clothing, including shoes and socks, and at least two students removed their shirts. M.G. and J.Si. removed all of their clothes except for their boxer shorts. None of the students completely disrobed.
E.C.'s parents picked the students up from the party shortly after midnight and took them to R.D. and S.D.'s house, where they were spending the night. S.D. allowed the students to share a "strawberry daiquiri breezer," a beverage that contains alcohol. After sharing the one alcoholic beverage, the students retired to M.D.'s bedroom. Once the students were in M.D.'s bedroom they used her computer to communicate electronically with M.G., who, along with J.Si., had returned home following the party. M.G. complained that the students had cheated during the card game earlier because he did not get a "show" and asked the students to e-mail him some nude photographs of them. M.G. requested a "cleavage shot," a "butt shot," and an "open shot." The students were initially reluctant to photograph themselves in the nude; however, M.G. eventually persuaded the students to take the photographs and to send them to him. The students agreed to do so after receiving assurances from M.G. and J.Si. that they would immediately delete the photographs after viewing them. The students took and e-mailed to M.G. and J.Si. five photographs depicting the students in the nude, in lewd poses, and using their fingers to manipulate their genitalia. The *Page 82 
students had never previously taken such photographs of themselves and intended that the photographs be viewed by only M.G. and J.Si.
Approximately one month after the party the students learned that the nude photographs of them were circulating among the students at Saint James and that some students were referring to them as "porn stars" and "porn queens." When the students confronted M.G. about the photographs he initially stated that someone had "hacked" into his computer and retrieved the photographs; however, he eventually admitted that he did not delete the photographs as he had promised the students he would and that he had circulated them to other students, who in turn had shared the photographs with even more students. Copies of the photographs were being widely disseminated throughout the student body at Saint James and in the City of Montgomery.
Jim Arrington, who was then the principal of the high school at Saint James School, first learned on February 13, 2001, of the possibility that inappropriate photographs were circulating among the student body when a teacher informed him that he had overheard several students discussing the photographs. The teacher knew few details about the matter and was unable to identify the students he had overheard discussing the photographs because they were obscured from his view. Arrington immediately notified Bell of the possibility that inappropriate photographs depicting Saint James students were being circulated, and Bell told him they needed to keep an "ear open" for that possibility. According to the students, the photographs continued to gain momentum during the period from February 13, 2001, through February 16, 2001. The students testified that at least one teacher, alluding to the photographs, had stated before a class of students that she was disgusted by the actions of "certain" students. K.H. testified that a teacher told a male student who was talking to her in the hall that he should not be talking to her because she was going to be expelled. The students also testified that another teacher told his class that the police were investigating the conduct of certain students and that the students would be going to prison. One student testified that when she arrived at school one morning she found a copy of the photographs sitting beside her assigned computer.
On the afternoon of February 16, 2001, someone anonymously left a copy of the photographs in the chair of a teacher who immediately took the photographs to Arrington, who in turn took the photographs to Bell. Arrington and Bell viewed the photographs and were able to identify at least one of the students. On that same day three of the students, who were cheer-leaders, spoke with their cheerleader sponsor, G.G.,[5]
regarding the photographs. G.G. told the students that she had been getting telephone calls all day from parents regarding the photographs and that they needed to tell their parents about the situation. The students spoke with their parents that same day about the existence of the photographs, but they did not initially reveal the nature of the photographs. The students also initially told their parents that M.G. had hacked into M.D.'s computer and stolen the photographs. Also on that same day, M.G. gave the students a letter, apologizing to them and taking full responsibility for not deleting the photographs as promised once he and J.Si. had viewed them and for circulating them to others. M.G.'s letter identified each of the students. *Page 83 
Bell testified that on Sunday, February 18, 2001, he notified Ketzler of the situation regarding the photographs and told Ketzler that he was going to begin investigating the situation on Monday. On Monday, February 19, 2001, Bell met with Arrington and Ketzler to discuss further the situation regarding the photographs. A teacher who taught all ninth-grade students was called into the meeting to positively identify from the photographs the three remaining students that Bell and Arrington had not yet identified. After the students were identified, Bell scheduled individual meetings with the students' parents. Bell, Arrington, and Ketzler met individually with each set of parents on February 19, 2001, with the exception of E.D. and S.D. E.D. informed Bell that he was out of town on business and could not return for a meeting that day and that he needed to confer with his attorney before meeting with him. During the meetings the parents were shown the photographs.[6] Bell informed the parents during the meetings that he would continue to investigate the matter, and he offered to meet with the students if the students wished. Bell testified that he was reluctant to meet with the students because of the nature of the problem. The parents contend that Ketzler and Bell were hostile during the meetings. They state that Bell told them that he would contact them to discuss the situation further.
During the course of the meetings with the parents, the letter from M.G. to the students apologizing for the dissemination of the photographs was presented to Bell, Arrington, and Ketzler. Because M.G.'s name came up during the meetings, Bell, Arrington, and Ketzler also met with M.G. and his mother, G.G., on the same day they met with the parents of three of the students. M.G. admitted that he had received the photographs from the students by e-mail and that he had forwarded the photographs electronically to others.
On Monday, February 19, 2001, a student discovered an explicit photograph of three female students had been placed as "wallpaper" on a computer in the sixth-grade computer lab. The student who discovered the photograph testified that only the lower torsos of the females were depicted in the photograph. The student notified a teacher and then deleted the photograph from the computer; he did not make a copy. The student and the teacher checked the "pictures bin" on the network server and discovered additional explicit photographs, which they deleted. Bell, Arrington, and Ketzler questioned the student about the incident. He was not shown a photograph of the students, and he did not identify the students as being the females in the photograph he had deleted from the computer in the sixth-grade computer lab.
In response to the discovery of the photograph on the computer in the sixth-grade computer lab, Bell ordered the school's computer system to be shut down and searched for any evidence of the photographs. During the search of the computer system, an e-mail was uncovered that indicated that one student was requesting from C.W.Sk., a student at Saint James School and the son of D.Sk., a copy of the photographs. It was ultimately discovered that C.W.Sk. had in his possession at his *Page 84 
home a computer disk, which contained the photographs of the students. Bell contacted C.W.Sk.'s mother, D.Sk., and asked her to bring the computer disk containing the photographs to him at the school. D.Sk. testified that she located the disk, which was labeled "nice pics," in C.W.Sk.'s bedroom and became curious as to its contents; she stated that she attempted to access the contents of the disk using C.W.Sk.'s computer, but, not being knowledgeable with computers, she was unable to do so. D.Sk. stated that on the way to the school to take the disk to Bell she stopped at a local fire station to have an acquaintance of hers assist her in accessing the contents of the disk. Her friend was able to gain access to the disk, and the contents were viewed briefly by approximately "four or five" firemen who were standing nearby; no copies of the disk were made. D.Sk. then took the disk to Bell.
The next day, Tuesday, February 20, 2001, Bell met with Arrington and Ketzler and informed them that he had decided to expel the students and M.G. J.Si. and C.W.Sk. were not to be expelled. Bell stated that his decision to expel the students was based upon: (1) the fact that their actions were immoral and illicit and in violation of the school handbook; (2) the impact of their actions upon the students' education and the education of the other students at Saint James School; and (3) the damage to the reputation of Saint James School. Bell immediately notified the students' parents of his decision to expel the students and, according to school policy, informed them that any further discussion of the matter would have to be with Ketzler and the board of directors. Bell expelled the students without any further discussions with the parents and without meeting with R.D. and S.D. Letters were sent to the five students who were expelled and their parents notifying them that their transcript record at Saint James School would show them as "withdrawn."
The parents describe the photographs as "disappointing," and some of the parents admit, as do some of the students, that the photographs are lewd and obscene. Because the students were 14 years old when the photographs were taken, the photographs, which contain full frontal nudity and/or lewd poses, constitute child pornography under the Alabama Child Pornography Act, §13A-12-190 et seq., Ala. Code 1975.
At the beginning of the 2000-20001 school year, the parents of each student enrolled at Saint James School signed an enrollment contract. Immediately above the signature line appears the following: "The student's continued enrollment in Saint James School will be contingent upon the student's compliance with school regulations as stated in the Student Handbook." The student handbook expressly states that "[o]ff-campus behavior which is illicit, immoral, illegal and/or which reflects adversely on Saint James" subjects the student to immediate expulsion. The student handbook also states that the "[headmaster will meet with students before dismissal." Each student enrolled at Saint James and his or her parent receives a copy of the student handbook, and each student must sign a pledge promising to abide by the student handbook. The students and their parents all signed the student handbook and were aware of its provisions.
The board of directors of Saint James School issues a policy manual setting forth the policies adopted by the board for the purpose of carrying out the objectives of Saint James School. The policy manual states that it is written in "broad terms" and that the regulations and procedures implementing the policies will be developed *Page 85 
by the headmaster. With regard to student conduct, the policy manual states:
 "1. The Board is interested in the conduct of Saint James students for two reasons. First, the Board believes that effective instruction requires a disciplined classroom and institutional environment. Second, the Board believes that student conduct influences the confidence of the community in the school and its students.
 "2. The Board has directed that a Handbook be published which will include policies on `academic and disciplinary standards: dress and appearance standards; and regulations on suspension and expulsion.'
 "3. The Board encourages the headmaster to apply these policies in a way which recognizes the unique situations which may arise. We prefer to rely on the headmaster's judgment than inflexible policies. At the same time the Board believes that it owes the headmaster guidance on the scope of student behavior it considers to be of concern to the school and worthy of the headmaster's attention.
 "4. The handbook has traditionally addressed student behavior on campus and at school sponsored functions. The Board's interest in student behavior extends beyond these limits. The school is conducted within the framework of Judeo-Christian beliefs and values. The Board wishes to express its disapproval of student behavior, on or off campus, which should be reasonably characterized as inconsistent with such beliefs or which could be seen as being illicit, illegal, or immoral. Examples of such behavior include [driving] while intoxicated; possession of illegal substances etc. . . . Examples also include pregnancy and cohabitation with a member of the opposite sex away from their parents' principal residence. The consequences of such behavior could well include expulsion.
 "5. The Board does not expect the headmaster to attempt to monitor student behavior at activities not sponsored by Saint James. The Board merely wishes to advise the headmaster that student behaviors as described above are inconsistent with the character of Saint James School. When an appropriate governmental agency brings such behavior to the headmaster's attention [it] warrants] his attention and such disciplinary action as he finds necessary."
The policy manual expressly states that the headmaster has the "sole authority for the dismissal of students from Saint James." The policy manual also provides that "no student will be dismissed without affording the parents the opportunity to meet with the headmaster before final action is taken on dismissal so they can present their views." The policy manual further sets forth the three principal reasons for dismissal: (1) failure to abide by the enrollment contract; (2) the student's failure to abide by the student-conduct policies contained in the student handbook; and (3) the failure to meet academic standards. Bell testified that Saint James School has no right to regulate private nonschool-related matters so long as those matters do not impact on the quality of the education of students. He further stated fundamental notions of fairness are at the heart of Saint James School's investigative process and that the parents and students have a right to expect the disciplinary process to result in fair and comparable disciplinary action for comparable offenses.
Following their expulsion from Saint James School, the students continued their education at another school. They contend that the quality of education at that *Page 86 
school was inferior to the quality of education at Saint James. The parents also contend that in expelling their children, Saint James unduly punished the students for an incident that they contend was a purely private matter.
 II. Case no. 1031517 A. Ketzler's Immunity Defense
Ketzler was sued in his capacity as chairman of the board of Saint James. In entering its summary judgment, the trial court found Ketzler to be immune from suit pursuant to § 6-5-336, Ala. Code 1975, as to all the plaintiffs' claims against him. Section 6-5-336(c) and (d), Ala. Code 1975, provide, in part:
 "(4) VOLUNTEER. A person performing services for a nonprofit organization, a nonprofit corporation, a hospital, or a governmental entity without compensation, other than reimbursement for actual expenses incurred. The term includes a volunteer serving as a director, officer, trustee, or direct service volunteer.
 "(d) Any volunteer shall be immune from civil liability in any action on the basis of any act or omission of a volunteer resulting in damage or injury if:
 "(1) The volunteer was acting in good faith and within the scope of such volunteer's official functions and duties for a nonprofit organization, a nonprofit corporation, hospital, or a governmental entity; and
 "(2) The damage or injury was not caused by willful or wanton misconduct by such volunteer."
It is undisputed that Saint James School is a nonprofit organization and that Ketzler was an unpaid volunteer. The plaintiffs argue that Ketzler was not acting within the scope of his official duties when he was present during Bell's meeting with the parents of three of the students on Monday, February 19, because, they argue, the board of directors of Saint James School had delegated all of its disciplinary authority to the headmaster. We disagree. Ketzler, as the chairman of the board, had an interest in obtaining as much information as possible about the developing situation, and his presence during the meeting with the parents of three of the students cannot be described as that of an interloper. We agree that in the policy manual the board of Saint James School delegated all of its disciplinary authority to the headmaster and expressly designated the headmaster as the "sole authority for the dismissal of students from Saint James." The policy manual also states that it is written in "broad terms" and hat the formulation of regulations and procedures to implement the policies is left to the headmaster. It is undisputed that Bell notified Ketzler of the developing situation regarding the photographs and that Bell requested Ketzler to be present in his office on Monday, February 19, during the meetings with the parents of three of the students. Thus, Ketzler's presence at the meetings was at Bell's discretion, and Bell was the person charged by the board with both disciplinary and rule-making authority. Finally, the record contains no evidence suggesting that the decision to dismiss the students from Saint James School was made by anyone other than Bell. Accordingly, we conclude that the trial court did not err in concluding as a matter of law that Ketzler was acting within the scope of his official duties as chairman of the Saint James board of directors and that he was therefore immune from liability, unless his actions would exempt him from the protection of § 6-5-336.
The plaintiffs further contend that Ketzler's conduct during a meeting with at least one set of parents was willful and *Page 87 
wanton and that he is therefore excluded from the protection of § 6-5-336. The plaintiffs' argument is based on the question they contend Ketzler asked them in a hostile or accusatory manner: "[H]ow did they think he felt having to tell his daughter . . . what she saw when she turned the computer on that morning?" The comment was taken by the plaintiffs to mean that Ketzler's daughter actually saw a copy of the photographs on a school computer when nothing in the record indicates that she did. "Wantonness" has been defined by statute as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." § 6-11-20(b)(3), Ala. Code 1975. This Court has defined "wantonness" as the "conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result."Alfa Mut. Ins. Co. v. Roush, 723 So.2d 1250, 1256
(Ala. 1998). Assuming, as we must, that Ketzler asked the question and that he asked it in a hostile or accusatory manner, such conduct does not rise to the level of wantonness as that term is defined by statute and by this Court. Accordingly, we conclude that the trial court did not err as a matter of law in determining that Ketzler's conduct was not willful and wanton. Therefore, we affirm that portion of the trial court's judgment determining that Ketzler was immune from suit as to all claims asserted against him by the plaintiffs. One of the plaintiffs' claims — tortious interference with contractual relationships — survives an immunity defense, and the summary judgment as to that claim is reviewed later in this opinion.
 B. Breach of Contract
The plaintiffs next argue that Saint James School breached the enrollment contract it had entered into with the plaintiffs because Saint James School failed to provide the students due process and equal protection during its investigation into the photographs and in imposing the disciplinary action that resulted. "To establish a breach-of-contract claim, a plaintiff must show `"(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages."'" Ex parte Coleman, 861 So.2d 1080, 1085
(Ala. 2003) (quoting State Farm Fire Cas. Co. v.Slade, 747 So.2d 293, 303 (Ala. 1999), quoting in turnSouthern Med. Health Sys., Inc. v. Vaughn,669 So.2d 98, 99 (Ala. 1995)).
The plaintiffs' contend that because the student handbook states that the headmaster "will meet with students before dismissal," the students were denied due process because Bell did not actually meet with the students before they were dismissed. Procedural due process requires that one be given notice and an opportunity to be heard. Brown's Ferry WasteDisposal Ctr., Inc. v. Trent, 611 So.2d 226 (Ala. 1992). Bell did not meet with the students before dismissing them because of the delicate nature of the subject matter of the investigation. Rather, in accordance with the policy manual, which gives the headmaster the discretion to apply the disciplinary policies in a manner that "recognizes the unique situations which may arise," Bell chose to meet with the parents of three of the students. At the meeting, Bell apprised the parents of the situation, showed them the photographs of the students, gave them an opportunity to respond, and offered to meet with the students themselves if the students wished. At no time did the parents deny that their daughters were the females depicted in the photographs, and, in fact, they presented Bell with M.G.'s letter of apology specifically identifying the students as the females depicted in the photographs. *Page 88 
Although Bell attempted to meet with R.D. and S.D., he was unable to do so because R.D. was out of town and wanted a chance to confer with his attorney before meeting with Bell. However, we note that R.D. and S.D. obviously had notice of the situation because M.D. testified that she told her parents of the existence of the photographs on Friday, February 16, 2001, and told them that the pictures contained nudity.
Additionally, we note that each student enrolled at Saint James School and his or her parent received a student handbook that states that "[o]ff-campus behavior which is illicit, immoral, illegal and/or which reflects adversely on Saint James" will subject a student to immediate expulsion. Each student and his or her parent signed a pledge promising to abide by the student handbook and were aware of its provisions.
The plaintiffs were on notice of the conduct that resulted in the students' dismissal from Saint James School; they were aware from the language of the student handbook that their conduct could lead to dismissal; and the parents had the opportunity to meet with Bell to discuss the situation regarding the photographs. Accordingly, we conclude that the plaintiffs were not denied due process and that Bell and Saint James did not breach the enrollment contract by failing to meet individually with the students before they were expelled.
The plaintiffs next argue that Saint James breached the enrollment contract because, they say, the disciplinary process was not applied fairly to them because the students were expelled while others who were in possession of the photographs were not expelled. Additionally, the plaintiffs point to other instances of illegal behavior by students, such as possession of drugs and alcohol on campus, that did not result in those students' being expelled. The plaintiffs' argument ignores the fact that the student handbook and the policy manual grants the headmaster the sole authority to expel students for off-campus conduct that can be reasonably construed as inconsistent with Judeo-Christian values or that could be seen as illicit, illegal, or immoral. The students' conduct in voluntarily taking sexually explicit photographs of themselves and then forwarding those photographs to M.G. by e-mail could reasonably be seen as being inconsistent with Judeo-Christian beliefs or as being illegal, illicit, and immoral. As headmaster, Bell had the option, which he chose, of expelling the students from Saint James School based on their conduct, i.e., taking and then forwarding the lewd photographs to M.G.
As for the plaintiffs' contentions that others who possessed the photographs were not expelled, we note that Bell concluded from the investigation that M.G. was the principal disseminator of the photographs; he was expelled from Saint James School along with the students. Although J.Si. and C.W.Sk., may have possessed a copy of the photographs, nothing indicates that they possessed a copy of the photographs on campus or that they disseminated the photographs.
Accordingly, we conclude that the plaintiffs' have failed to state a prima facie case of breach of contract on the part Saint James School; Bell simply chose to exercise in this case and not in others certain options granted him by the student handbook and the policy manual.
The plaintiffs argue next that Saint James School denied them due process and thereby breached the enrollment contract because Bell dismissed the students without having conclusively identified them as being the females in the photographs. *Page 89 
This argument is without merit. First, Bell and Arlington identified at least one student from the photographs and then had a teacher identify the remaining students from the photographs. Second, during the meeting with Bell, the parents of three of the students either all admitted or did not deny that the students were the females depicted in the photographs. Third, the parents themselves provided Bell with the apology letter authored by M.G., which specifically identified the students as the females in the photographs. Finally, the plaintiffs have not denied that the photographs submitted to the trial court under seal are in fact the photographs taken by the students and forwarded to M.G. Again, the plaintiffs have failed to present a prima facie case of breach of contract based on this contention.
Accordingly, the summary judgment in favor of Saint James on the plaintiffs' claims alleging a breach of contract is affirmed.
 C. Negligence and Wantonness
The plaintiffs next argue that Saint James School and Bell were negligent and wanton (1) in failing to protect or secure the school's computer system to prevent unauthorized or inflammatory material from being placed on the computers in the school computer lab; (2) in conducting the underlying investigation that led to the students' expulsion; (3) in failing to investigate and determine who placed the photographs on the computers; and (4) in failing to protect the confidentiality of the students' records.
The plaintiffs have failed to satisfy the minimum requirements of Rule 28(a)(10), Ala. R.App. P. Rule 28(a)(10) provides that an appellant's brief shall contain "[a]n argument containing the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." The plaintiffs cite only a single case from the state of New Jersey relative to their negligence claims; it merely sets forth the general duty a school owes to its students. The plaintiffs cite no caselaw in support of their wantonness claims.[7] Aside from the single case cited, the plaintiffs do not discuss or cite any authority relative to their negligence claims. Additionally, the plaintiffs' argument consists primarily of a series of factual statements and conclusory statements of liability on the part of Bell and Saint James School, with no real explanation as to how or why Bell and Saint James School are liable. It is well established that general propositions of law are not considered "supporting authority" for purposes of Rule 28. Ex parte Riley,464 So.2d 92 (Ala. 1985). This Court will not "create legal arguments for a party based on undelineated general propositions unsupported by authority or argument." Spradlin v.Spradlin, 601 So.2d 76, 79 (Ala. 1992). Further, it is well settled that "`[w]here an appellant fails to cite any authority for an argument, this Court may affirm the judgment as to those issues, for it is neither this Court's duty nor its function to perform all the legal research for an appellant.'" Spradlinv. Birmingham Airport Auth., 613 So.2d 347, 348 (Ala. 1993) (quoting Sea Calm Shipping Co., S.A. v. Cooks,565 So.2d 212, 216 (Ala. 1990)). Accordingly, the summary judgment is affirmed as to the negligence and wantonness claims. *Page 90 
 D. Invasion of Privacy
The plaintiffs next argue that Saint James School and Bell invaded the students' privacy. This Court has defined the tort of invasion of privacy as the "`intentional wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.'" Rosen v. Montgomery SurgicalCtr., 825 So.2d 735, 737 (Ala. 2001), quoting Carter v.Innisfree Hotel, Inc., 661 So.2d 1174, 1178 (Ala. 1995). The tort of
 "invasion of privacy consists of four limited and distinct wrongs: (1) intruding into the plaintiffs physical solitude or seclusion; (2) giving publicity to private information about the plaintiff that violates ordinary decency; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; or (4) appropriating some element of the plaintiffs personality for a commercial use."
Johnston v. Fuller, 706 So.2d 700, 701 (Ala. 1997). Each of these categories of invasion of privacy has distinct elements, and each category establishes a separate privacy interest that may be invaded. Regions Bank v. Plott,897 So.2d 239 (Ala. 2004). The plaintiffs contend that Saint James School and Bell invaded the students' privacy by committing the first three wrongs: (1) intruding into the students' physical solitude; (2) giving publicity to private information about the students; and (3) putting the students in a false position in the public eye.
 1. Intrusion into the students' physical solitude
The plaintiffs appear to argue that Bell and Saint James School intruded upon the physical solitude of the students by conducting the investigation into the appearance of the photographs on the Saint James campus and by requesting D.Sk. to bring to campus the disk containing the photographs as part of that investigation. This Court has stated:
 "In Phillips v. Smalley Maintenance Services, Inc., 435 So.2d 705 (Ala. 1983), this Court adopted the Restatement (Second) of Torts
definition of the wrongful-intrusion branch of the invasion-of-privacy tort:
 "`One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.'
 "Restatement (Second) of Torts § 652B (1977). Comment c to § 652B states in part: `The defendant is subject to liability under the rule stated in this Section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs.' The wrongful intrusion may be by physical intrusion into a place where the plaintiff has secluded himself, by discovering the plaintiffs private affairs through wiretapping or eavesdropping, or by some investigation into the plaintiffs private concerns, such as opening private mail or examining a private bank account. Restatement (Second) of Torts § 652B cmt. b; see Vernars v. Young, 539 F.2d 966 (3d Cir.1976) (holding that invasion of privacy occurred when mail addressed to plaintiff was opened by defendant without plaintiffs consent); see generally, W. Page Keeton, et al., Prosser and Keeton on the Law of Torts, § 117, at 854-55 (5th ed.1984); 6 Am.Jur.2d Privacy §§ 51-57 (1990). Further, if the means of gathering the information are excessively objectionable and improper, *Page 91 
a wrongful intrusion may occur. See Hogin v. Cottingham, 533 So.2d 525 (Ala. 1988) (wrongful intrusion occurs when there has been abrupt, offensive, and objectionable prying into information that is entitled to be private)."
Johnston, 706 So.2d at 702.
The plaintiffs have failed to present any evidence indicating that the investigation conducted by Bell was "highly offensive" or "excessively objectionable and improper" under the circumstances. Bell notified Ketzler after Arrington had notified him of the existence of the photographs on campus. As discussed above, Ketzler is the chairman of the board of directors of Saint James, and it was within Bell's discretion, pursuant to the authority delegated to him as the headmaster, to apprise Ketzler of the situation and to have him attend the meetings with the parents. After discovering the photographs on campus, Bell and Arrington identified the students in the photographs by having a teacher who taught all ninth-grade students come to Bell's office to view the photographs. Once the students were identified, Bell began scheduling meetings with the parents. Bell learned of M.G.'s involvement through the meetings with the parents of three of the students (there was never a meeting with R.D. and S.D.), and he subsequently met with M.G. and his mother, G.G. In the meantime, one of the photographs was discovered on a computer in the sixth-grade computer lab. Bell ordered the school's computer system to be shut down, and the school searched for other evidence of the photographs on the computer system. Through those efforts the e-mail requesting a copy of the photographs from C.W.Sk. was discovered. C.W.Sk. was questioned, and it was discovered that he had in his possession at his house a disk containing the photographs. Bell then requested his mother, D.Sk., bring the disk to the school and turn it over to him.
Viewing the evidence in a light most favorable to the plaintiffs, as we must, Hanners, supra, it appears that Bell involved in the investigation only those persons necessary to identify the students in the photographs, to follow up on information developed from the investigation, and to confiscate all the photographs. Nothing Bell did in conducting the investigation can be viewed as being "highly offensive" or "excessively objectionable and improper." Accordingly, the plaintiffs have failed to establish a prima facie case of invasion of privacy by intrusion into the students' physical solitude.
 2. Giving publicity to private information
The plaintiffs next argue that Saint James School and Bell invaded the students' privacy by giving publicity to a private matter. The plaintiffs apparently seek to hold Saint James School and Bell responsible for the wide dissemination of the photographs. This Court has stated:
 "The Restatement provides:
 "`One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that
 "`(a) would be highly offensive to a reasonable person, and
 "`(b) is not of legitimate concern to the public'
"Restatement (Second) of Torts § 652D (emphasis added). The comments to § 652D describe the key element of this tort, `publicity,' as follows:
 "`"Publicity," as it is used in this Section, differs from "publication," as that term is used . . . in connection with liability for defamation. "Publication," in that sense, is a word of art, *Page 92 
which includes any communication by the defendant to a third person. "Publicity," on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written or by any other means. It is one of a communication that reaches or is sure to reach, the public.
 "`Thus it is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiffs private life to a single person or even to a small group of persons.'
 `'Restatement (Second) of Torts § 652D cmt. a (1977) (emphasis added). Accord Nobles v. Cartwright, 659 N.E.2d 1064, 1074
(Ind.Ct.App. 1995)."
Johnston, 706 So.2d at 703.
The plaintiffs contend that Saint James School publicized the photographs to a large number of people through its teachers, its students, and the parents of its students. Although word of the existence of the photographs was pervasive among the Saint James "community," the plaintiffs have presented no evidence indicating that Bell, Saint James School, or anyone associated with the faculty of Saint James School disseminated or communicated to the public at large the existence of the photographs. As discussed above, Bell communicated regarding the existence of the photographs with only a small group of persons necessary to conduct the investigation into the photographs and to confiscate those photographs. Additionally, although the students testified that two teachers had made comments to their classes regarding the actions of certain students in connection with the photographs, nothing indicates that either teacher identified the students as being the females in the photographs.
Further, the evidence indicates that by the time the photographs were discovered on campus on Friday, February 16, 2001, and the time the investigation began in earnest on Monday, February 19, 2001, knowledge of the photographs was pervasive throughout the Saint James community. In other words, the matter was no longer private, and the students could no longer have had an expectation of privacy regarding the photographs because there is "no privacy in that which is already public."Abernathy v. Thornton, 263 Ala. 496, 498, 83 So.2d 235,237 (1955). Lastly, with the discovery on the Saint James campus of the explicit photographs, which meet the definition of child pornography under Alabama law, and the wide dissemination of those photographs throughout the Saint James community, the matter had become one of a legitimate public concern, and the students could no longer claim a right to privacy in the matter.Johnston, 706 So.2d at 703. Accordingly, we conclude that the plaintiffs have failed to establish a prima facie case of invasion of privacy by giving publicity to a private matter.
 3. Putting one in a false position in the public eye
The plaintiffs next argue that Saint James School and Bell invaded the students' privacy by expelling them from Saint James School and thereby assuring that they would continue to be viewed as "porn stars" or "porn queens." They contend that the students' expulsion from Saint James School confirmed to the public that they were indeed the students rumored to be in the photographs and cast aspersions on their character. We initially note that the plaintiffs have failed to cite *Page 93 
any authority in support of this argument and thereby fail to comply with Rule 28(a)(10), Ala. R.App. P.
This Court has stated the following regarding a claim of invasion of privacy by putting one in a false light:
 "`"One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
 "`"(a) the false light in which the other was placed would be highly offensive to a reasonable person, and
 "`"(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."'"
Butler v. Town of Argo, 871 So.2d 1, 12
(Ala. 2003) (quoting Schifano v. Greene County Greyhound Park,Inc., 624 So.2d 178, 180 (Ala. 1993), quoting in turnRestatement (Second) of Torts § 652E (1977)). "`A false-light claim does not require that the information made public be private,' but it does require that `the information . . . be false.'" Regions Bank v. Plott,897 So.2d 239, 244 (AJa.2004) (quoting Butler,871 So.2d at 12).
The "false-light" version of an invasion-of-privacy claim requires that a defendant give publicity to a matter that places one in a false light. As discussed above, the plaintiffs have failed to present evidence indicating that Saint James School and Bell gave publicity to the photographs. Additionally, the plaintiffs have failed to present any evidence indicating that, in expelling the students, Saint James School and Bell acted in reckless disregard as to the false light in which the students would potentially be placed. On the contrary, Bell, as discussed above, acted well within the authority delegated to him as the headmaster of Saint James School in expelling the students. Accordingly, the plaintiffs' have failed to establish a prima facie case of invasion of privacy by placing the students in a false light.
 E. Tort of Outrage
The plaintiffs next argue that the conduct of Saint James School and Bell in investigating and then expelling the students was outrageous. In order to prevail on a tort-of-outrage claim, a plaintiff is required to prove that the defendant's conduct "`(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.'"Harrelson v. R.J., 882 So.2d 317, 322 (Ala. 2003) (quoting Thomas v. BSE Indus. Contractors, Inc.,624 So.2d 1041, 1043 (Ala. 1993)). Additionally,
 "`[a]ny recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'"
Travelers Indem. Co. of Illinois v. Griner,809 So.2d 808, 810 (Ala. 2001) (quoting American Road Serv. Co. v.Inmon, 394 So.2d 361, 365 (Ala. 1980)) (citations omitted).
The plaintiffs have failed to present any evidence indicating that the conduct of Saint James School and Bell in conducting the investigation into the existence of the photographs and subsequently expelling the students from Saint James School could be viewed as being so extreme or outrageous as to be regarded as atrocious or utterly intolerable in a civilized society. Accordingly, the summary judgment is affirmed as to this issue. *Page 94 
 F. Tortious Interference with Contractual Relationship
The plaintiffs next argue that Ketzler wrongfully interfered with the contractual relationship they enjoyed with Saint James School. As discussed above, Ketzler enjoys immunity from the plaintiffs' other claims pursuant to § 6-5-336, Ala. Code 1975. However, because the plaintiffs' claim of a tortious interference with a contractual relation is based on the intentional conduct of the tortfeasor, we will address the merits of this claim.
In order to establish a prima facie case of intentional interference with a business or contractual relationship, there must be proof of each of the following:
 "`(1) The existence of a contract or business relation; (2) the defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; and (4) damage to the plaintiff as a result of the defendant's interference.'"
McCluney v. Zap Prof I Photography, Inc.,663 So.2d 922, 925 (Ala. 1995) (quoting Utah Foam Prods., Inc. v.Polytec, Inc., 584 So.2d 1345, 1352-53 (Ala. 1991)). SeeWaddell Reed, Inc. v. United Investors Life Ins.Co., 875 So.2d 1143 (Ala. 2003), for a detailed discussion of the elements of this tort. The plaintiffs have failed to present any evidence indicating that Ketzler intentionally interfered with the contractual relationship they had with Saint James School. At best the evidence indicates that Ketzler was notified of the existence of the photographs by Bell; that he was present during the meetings with the parents of three of the students; and that he may have questioned some of the parents in a accusatory manner. Nothing indicates that Ketzler coerced or mandated that Bell expel the students from Saint James School. Accordingly, the trial court's summary judgment is affirmed as to this issue.
 III. Case no. 104.04.86
The plaintiffs' case against J.Si. is predicated in large part on whether he had any involvement in soliciting the photographs from the students and whether he received those photographs by e-mail based on a promise that the photographs would be deleted and that they would not be shown to anyone else. The crux of the students' testimony is that they were communicating with M.G. by computer on New Year's Eve night and that he was the one who requested that they take and send the photographs. Nothing indicates that J.Si. actually requested that the students send the photographs. K.H. testified that she and the other students were communicating with M.G. online when he asked them to send him the photographs. However, the plaintiffs point to the deposition testimony of K.H. and contend that J.Si. agreed to delete the photographs once M.G. and J.Si. received and viewed them. K.H. testified as follows:
 "Before we took [the photographs] we made them promise that if we did these pictures that they would delete them as soon as they got them. We got both of them to say yes, that they would. They promised. Then afterwards, we asked them again, and they promised they would as soon as they got done looking at them."
Additionally, K.H. testified that she was visiting J.Si. at his house on February 14, 2001, and that J.Si. was "fooling around on the computer [when] he got into a program and [the photographs] came up." She stated that she made him delete them from his computer immediately.
The plaintiffs' case against D.Sk. is predicated upon her actions in retrieving the computer disk containing the photographs *Page 95 
from her son's bedroom, accessing the contents of the disk at a local fire station, and then delivering the disk to Bell at the Saint James School campus.
 A. Bailment/Conversion
The plaintiffs state in their brief that several of their theories of recovery are based on the existence of a bailment between the students, on the one hand, and M.G. and J.Si., on the other, by which the students delivered to M.G. and J.Si. the photographs with specific instructions that M.G. and J.Si., as the bailees, delete the photographs immediately after receiving them. This Court has stated:
 "`A bailment is defined as the delivery of personal property by one person to another for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed, and the property returned or duly accounted for when the special purpose is accomplished, or kept until the bailor reclaims it. In order for a bailment to exist the bailee must have voluntarily assumed the custody and possession of the property for another.'"
Ziva Jewelry, Inc. v. Car Wash Headquarters, Inc.,897 So.2d 1011, 1014 (Ala. 2004) (quoting S/M Indus., Inc. v.Hapag-Lloyd AG., 586 So.2d 876, 881-82 (Ala. 1991)). Further, this Court has stated:
 "In order to constitute a bailment, there must be a change of possession, actual or constructive, and the bailee must have voluntarily assumed the custody and possession of the property for another. Lewis v. Ebersole, 244 Ala. 200, 12 So.2d 543 (1943). Change of possession necessarily requires a change of actual or constructive control over the item of property, and there must be an intention on the part of the bailee to exercise that control. 8 Am.Jur.2d Bailments § 66 (1980)."
Farmer v. Machine Craft, Inc., 406 So.2d 981, 982-83
(Ala.Civ.App. 1981). Citing Martin v. Luckie Forney,Inc., 549 So.2d 18, 19 (Ala. 1989), the plaintiffs contend that an action based on the bailment of personal property can be brought against one who "converts, injures, or loses the subject matter of the bailment."
The plaintiffs argue in their brief that the students had no intentions that the photographs would become the property of anyone other than M.G. and J.Si., and that J.Si. is liable for conversion of the photographs because, they argue, he wrongfully delivered those photographs to unauthorized third persons. This Court has stated:
 "Conversion consists of (1) an act or omission by the defendant (2) with the intent to assert control over property (3) that belongs to the plaintiff (4) resulting in substantial interference to the plaintiffs possessory rights. In other words, a conversion is said to consist'"either in the appropriation of the thing to the party's own use and beneficial enjoyment, or its destruction, or in exercising of dominion over it, in exclusion or defiance of the plaintiffs right, or in with-holding the possession from the plaintiff, under a claim of title inconsistent with his own."' But `[t]he bare possession of property without some wrongful act in the acquisition of possession, or its detention, and without illegal assumption of ownership or illegal user or misuser, is not conversion.'"
Martin, 549 So.2d at 19 (citations omitted). InS/M Industries, Inc., 586 So.2d at 883, this Court adopted the trial court's order, which stated:
 "`A conversion may occur where there is a wrongful delivery to a third party of personal property by a bailee resulting in its loss to the owner of the property. A delivery to an unauthorized person is *Page 96 
 as much a conversion as would be the sale of property, or an appropriation of it to the bailee's own use. In such a case neither a sincere or apparently well-founded belief that the delivery to an unauthorized person was right nor the exercise of any degree of care constitutes a defense even to a gratuitous bailee.'"
The existence of a bailment is dependent upon a contract between the bailor and the bailee. Ziva Jewelry, supra.
We note the following:
 "Under Alabama law, one who is unmarried and has not reached the age of 19 years is deemed to be a minor, i.e., subject to the disabilities of nonage (although such disabilities may, in certain circumstances, be removed by a judgment of a juvenile court). See § 26-1-1, § 26-13-1 et seq., § 304-15, and § 30-4-16, Ala. Code 1975. Among the disabilities of nonage is the incapacity to make a binding contract: `It is a well-established general rule at common-law, and recognized in this state, that a minor is not liable on any contract he makes and that he may disaffirm the same.' Children's Hosp. of Birmingham, Inc. v. Kelley, 537 So.2d 917, 917 (Ala.Civ.App. 1987), aff'd in pertinent part, rev'd on other grounds, Ex parte Odem, 537 So.2d 919 (Ala. 1988)."
Williams v. Baptist Health Sys., Inc., 857 So.2d 149,151 (Ala.Civ.App. 2003). The students and J.Si. were minors at the time of this incident; therefore, they lacked the capacity to enter into a contract. Because there was no contract, there was necessarily no bailment of the photographs.
However, even assuming that a bailment existed between J.Si. and the students, the evidence viewed in a light most favorable to the plaintiffs indicates only that J.Si. promised to delete the photographs and possessed the photographs on the computer located at his house. The plaintiffs have presented no evidence indicating that J.Si. wrongfully conveyed the photographs to other persons. In fact, it was M.G. who took full responsibility in his letter of apology to the students for the wide dissemination of the photographs.
The plaintiffs also contend that D.Sk. wrongfully interfered with the students' possessory rights in the photographs. We disagree. D.Sk. merely possessed the computer disk containing the photographs after she located the disk in her son's bedroom and endeavored to discover the contents of the disk by accessing its contents at the fire station, and then delivered the photographs to Bell as he requested. The plaintiffs presented no evidence indicating that D.Sk. engaged in any wrongful conduct in gaining possession of the photographs or any unlawful exercise of dominion or control over the photographs. We further note that no bailment relationship existed between the students and D.Sk. because D.Sk. did not voluntarily assume the custody or possession of the photographs from the students. Farmer,supra. Again, D.Sk. simply took the disk containing the photographs from her son's room, accessed the contents of the disk at the fire station, and then delivered the disk to Bell as he had requested.
Additionally, nothing in the record indicates that J.Si. or D.Sk. significantly interfered with the student's possessory rights in the photographs or that the photographs were ever lost. In Poff v. Hayes, 763 So.2d 234 (Ala. 2000), the defendant removed original documents from the office of the plaintiff for the purpose of photocopying those documents and then returned those documents to their place once they had been copied. This Court held that such a dispossession of the documents by the defendant did not seriously interfere with the possessory interests of *Page 97 
the plaintiff so as to support a conversion claim. Here, the students were at all times in possession of the original photographs until they chose to delete the photographs from M.D.'s computer. Therefore, there was no serious interference with their possessory interests in the photographs and the photographs could not be said to have been lost for purposes of a breach-of-bailment claim.
Accordingly, the summary judgment entered in favor of J.Si. and D.Sk. on the plaintiffs' bailment and conversion claims is affirmed.
 B. Negligence
The plaintiffs next argue that a bailment existed between the students and J.Si., whereby J.Si. assumed the duty to handle the photographs subject to the terms of the bailment, i.e., he would delete the photographs once he had viewed them. The plaintiffs contend that because J.Si. negligently failed to delete the photographs they were damaged when the photographs were widely disseminated.
As discussed above, no bailment existed because the minors did not have the capacity to make a contract. However, because J.Si. promised to delete the photographs after viewing them, we conclude that he assumed a duty he could be held liable for breaching. Accordingly, we will address the plaintiffs' negligence claim, regardless of the existence of a bailment.
In order to establish a negligence claim, a plaintiff must prove: "(1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury."Martin v. Arnold, 643 So.2d 564, 567 (Ala. 1994). This Court has stated the following regarding the element of proximate cause:
 "`"The proximate cause of an injury is that cause which, in the natural and probable sequence of events, and without the intervention or coming in of some new or independent cause, produces the injury, and without which the injury would not have occurred."' `[I]f a new, independent act breaks the chain of causation, it supersedes the original act, which thus is no longer the proximate cause of the injury.' `[A]n [act] is superseding only if it is unforeseeable. A foreseeable intervening [act] does not break the causal relationship between the defendants' actions and the plaintiffs' injuries.'
". . .
 "`[T]he line is drawn to terminate the defendant's responsibility' for injuries of the unanticipated sort resulting from `intervening causes which could not reasonably be foreseen, and which are no normal part of the risk created.' Among those injuries are those that result from `intentional or criminal acts against which no reasonable standard of care would require the defendant to be on guard,' such as the `destructive meddling with property.'"
Alabama Power Co. v. Moore, 899 So.2d 975, 979
(Ala. 2004) (citations omitted).
As discussed above, there is no evidence in the record indicating that J.Si. actually disseminated the photographs to anyone. Rather, the evidence indicates that M.G. was the sole disseminator of the photographs, a fact he admitted in his apology letter to the students. We conclude that M.G.'s intentional act of disseminating the photographs to others constitutes a sufficient intervening cause that supersedes J.Si.'s failure to delete the photographs as the proximate cause of the student's alleged injury.
Accordingly, the summary judgment in favor of J.Si. on the negligence claim is affirmed. *Page 98 
 C. Invasion of Privacy 1. Intrusion into the students' physical solitude
The plaintiffs argue that J.Si. intruded upon the physical solitude of the students apparently by obtaining the photographs and then disseminating them. As stated earlier, in order to state a claim for invasion of privacy by intrusion upon one's solitude, the plaintiff must establish a highly offensive intrusion upon his solitude or seclusion or his private affairs.Johnston, supra. See Hogin v. Cottingham,533 So.2d 525 (Ala. 1988) (holding that a wrongful intrusion occurs when there has been abrupt, offensive, and objectionable prying into information that is entitled to be private). The evidence indicates that the students voluntarily e-mailed the photographs to M.G. and J.Si. Nothing in the record indicates that J.Si. wrongfully intruded into the private matters of the students in order to obtain the photographs. Additionally, to the extent that this claim is based on J.Si.'s alleged dissemination of the photographs, it also fails. As discussed above, the evidence indicates only that J.Si. possessed the photographs. The plaintiffs have presented no evidence indicating that J.Si. actually disseminated the photographs.
As to D.Sk., the plaintiffs presented no evidence indicating that she obtained the computer disk containing the photographs by means of a wrongful or highly offensive intrusion or other objectionable or offensive prying into the students' private affairs. D. Sk. simply took the disk from her son's bedroom and delivered it to the school as Bell requested.
Accordingly, the summary judgment in favor of J.Si. and D.Sk. on the plaintiffs' claims of invasion of privacy by intrusion is affirmed.
 2. Giving publicity to private information
The plaintiffs next argue that J.Si. and D.Sk. invaded the privacy of the students by giving publicity to private information. In order to establish a claim of invasion of privacy by giving publicity to a private matter, the plaintiff must establish that the defendant gave publicity to a matter (1) that would be highly offensive to a reasonable person, and (2) that is not a matter of a legitimate public concern.Johnston, supra. "Publicity," as it relates to this kind of invasion of privacy, means that the matter is made public by communicating it to a large segment of the public, or to so many persons that the matter must be regarded as substantially certain to become public knowledge. Johnston,supra. Thus, there is no invasion of privacy by publicity of a private matter if the matter is communicated only to a single person or to a small group of persons.
Again, the plaintiffs' claim against J.Si. of invasion of privacy by giving publicity to a private matter fails because the plaintiffs have failed to produce any evidence indicating that J.Si. disseminated the photographs to anyone.
The plaintiffs argue that D.Sk. invaded the privacy of the students by giving publicity to a private matter because she allowed the photographs to be viewed by individuals at the fire station and by discussing the matter of the photographs with the parents of other Saint James students.
The evidence indicates that once D.Sk. located the disk in C.W.Sk.'s bedroom labeled "nice pics," she became curious as to its contents and attempted to access the contents of the disk using C.W.Sk.'s computer, but she was unable to do so. D.Sk. stated that on the way to the school to deliver the disk to Bell she stopped at a local fire station to have an acquaintance of hers assist her in accessing the contents of *Page 99 
the disk. The contents of the disk were accessed and viewed briefly by approximately "four or five" firemen who were standing nearby. No copies of the disk were made. D.Sk. then took the disk to Bell. D.Sk. also testified that she subsequently discussed the matter of the photographs with other parents of students at Saint James School. The plaintiffs have failed to present any evidence indicating that D.Sk. gave publicity to the existence of the photographs to the public at large. Although the photographs were viewed by individuals at the fire station, the evidence indicates that the photographs were viewed only briefly by a small group of firemen and that no copies of the disk or the photographs were made. Thus, there was no publicity given to the photographs as that term is defined relative to this version of invasion of privacy. Johnston,supra.
Further, the fact that D.Sk. subsequently discussed the matter of the photographs with others does not constitute invasion of privacy by giving publicity to a private matter. By the time D.Sk. had the conversations with the other parents, the matter was no longer private, and the students could no longer have had an expectation of privacy regarding the photographs.Abernathy, supra. Additionally, with the discovery of the explicit photographs on the campus of Saint James and the wide dissemination of those photographs throughout the Saint James community, the matter had become one of a legitimate public concern, and the students could no longer claim a right to privacy in the matter. Johnston, supra.
Accordingly, we conclude that the plaintiffs have failed to establish a prima facie case of invasion of privacy by giving publicity to a private matter against J.Si. and D.Sk., and the summary judgment as to this issue is affirmed.
 3. Putting one in a false position in public eye
The plaintiffs next argue that J.Si. and D.Sk. invaded the students' right to privacy by placing them in a false light. This Court has stated the following regarding a false-light claim of invasion of privacy:
 "`"One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
 "`"(a) the false light in which the other was placed would be highly offensive to a reasonable person, and
 "`"(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."'"
Butler, 871 So.2d at 12 (quoting Schifano,624 So.2d at 180, quoting in turn Restatement (Second) ofTorts § 652E (1977)).
The "false-light" version of an invasion-of-privacy claim requires that a defendant give publicity to a matter that places one in a false light. As discussed earlier, the plaintiffs have failed to present any evidence indicating that J.Si. and D.Sk. gave publicity to the matter of the photographs, much less any evidence indicating that J.Si. and D.Sk. acted with any reckless disregard as to any false light in which the students may have potentially been placed. Accordingly, the plaintiffs' have failed to establish a prima facie case of invasion of privacy by placing the students in a false light, and the summary judgment as to this issue is affirmed.
 D. Defamation
The plaintiffs next argue that J.Si. delivered copies of the photographs to others without authorization and that in the process he implicitly made the false statement *Page 100 
that the students approved of the content of the photographs and that they have low moral standards. This Court has stated:
 "`To establish a prima facie case of defamation, the plaintiff must show [1] that the defendant was at least negligent, see Mead Corp. v. Hicks, 448 So.2d 308 (Ala. 1983); Restatement (Second) of Torts § 558, § 580B (1977), [2J in publishing [3] a false and defamatory statement to another [4] concerning the plaintiff, Restatement (Second) of Torts § 558, [5] which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod). Restatement (Second) of Torts § 558; see also Albert Miller Co. v. Corte, 107 F.2d 432 (5th Cir.1939), cert. denied, Corte v. Albert Miller Co., 309 U.S. 688, 60 S.Ct. 890, 84 L.Ed. 1031 (1940).'"
Gary v. Crouch, 867 So.2d 310, 315 (Ala. 2003) (quoting Nelson v. Lapeyrouse Grain Corp.,534 So.2d 1085, 1091 (Ala. 1988)).
The plaintiffs' defamation claim against J.Si. fails for the same reasons as the plaintiffs' invasion-of-privacy claims failed: the plaintiffs have presented no evidence indicating that J.Si. disseminated — or in this instance — published the photographs to anyone else.
The basis of the plaintiffs' defamation claim against D.Sk. is that she communicated or published the photographs to the persons at the fire station thereby conveying the false statement that the students approved of the photographs and that they had low moral standards. Truth is an absolute defense to a defamation claim. Foley v. State Farm, Fire Cas. Ins.Co., 491 So.2d 934 (Ala. 1986). In McCaig v. TalladegaPublishing Co., 544 So.2d 875 (Ala. 1989), customers of a local electrical cooperative sued the publishers of a local newspaper alleging defamation because an article published in the newspaper described the customers as using a "floating meter" to measure the amount of electricity they received at their business. The article stated that the customers were receiving electricity at the lower residential rate rather than the higher commercial rate. The article stopped short of saying the customers had stolen the electricity or that they had obtained the cheaper electricity by fraud, although that could certainly have been inferred from the tone of the article. In affirming the summary judgment in favor of the defendants, this Court found that the element of falsity was not established. This Court stated:
 "The undisputed testimony of the parties indicates that facts set out in the article are in their most literal sense true. Given the truthfulness of the published statements, the trial court correctly determined that the statements, as a matter of law, were not capable of having a defamatory meaning, the first prong of the test of defamation."
McCaig, 544 So.2d at 878-79. In analyzing the contents of the article in McCaig, this Court did not infer or assume from the article any defamatory content.
Here, the information the students allege D.Sk. published, i.e., the photographs, are the same photographs the students' delivered to M.G. and J.Si. by e-mail. Thus, the matter published by D.Sk. cannot said to be false because there is no dispute that the students posed for and delivered the photographs they accuse D.Sk. of publishing. The plaintiffs argue that the false statement — that the students approved of the photographs and that they have low moral standards — is to be inferred from the photographs. However, based on this Court's holding in McCaig, we cannot infer or assume any defamatory content from the publication of the photographs. *Page 101 
As with the article in McCaig, the photographs here are not capable of having a defamatory meaning, and the plaintiffs have failed to meet the falsity prong of a defamation claim.
Accordingly, the summary judgment in favor of J.Si. and D.Sk. on the plaintiffs' defamation claims is affirmed.
 E. Fraud
The plaintiffs next argue that J.Si. induced the students to take and send the photographs based on a promise that he would delete the photographs once he viewed them. The plaintiffs' fraud claim against J.Si. is in the nature of promissory fraud. This Court has stated:
 "`The elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation. To prevail on a promissory fraud claim such as that at issue here, that is, one based upon a promise to act or not to act in the future, two additional elements must be satisfied: (5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had an intent to deceive.'"
Waddell Reed, Inc. v. United Investors Life Ins.Co., 875 So.2d 1143, 1160 (Ala. 2003) (quoting Padgettv. Hughes, 535 So.2d 140, 142 (Ala. 1988)). Further,
 "`[w]hile the mere failure to perform the promised act is not by itself sufficient evidence of fraudulent intent, for purposes of a promissory-fraud claim, "the factfinder may consider that failure, together with other circumstances, in determining whether, at the time the promise was made, the promisor intended to deceive."'"
Byrd v. Lamar, 846 So.2d 334, 343 (Ala. 2002) (quotingEx parte Grand Manor, Inc., 778 So.2d 173, 182
(Ala. 2000)).
Viewing the evidence in a light most favorable to the plaintiffs, as we are required to do, Hanners, supra, we conclude that J.Si. represented to the students that he would delete the photographs once he viewed them. However, we conclude that the plaintiffs' have failed to present any evidence indicating that at the time J.Si. promised to delete the photographs he had no present intention of doing so and intended to deceive the students. The only evidence that indicates J.Si. may have had no intention of deleting the photographs when he made the promise to do so and thus had an intent to deceive the students is the fact that the photographs were not deleted. However, this is insufficient evidence of fraudulent intent and will not overcome a motion for a summary judgment. Byrd,supra. See also Henri N. Beaulieu, Jr. v. WynfreyHotel, Ltd., 718 So.2d 83, 85 (Ala.Civ.App. 1998).
 IV. Conclusion
The summary judgments in favor of the Saint James defendants and D.Sk. and J.Si. are affirmed.
1031517 — APPLICATION OVERRULED; NO-OPINION AFFIRMANCE OF JUNE 9, 2006, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
1040486 — APPLICATION OVERRULED; NO-OPINION AFFIRMANCE OF JUNE 9, 2006, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
NABERS, C.J., and SEE, HARWOOD, and STUART, JJ., concur.
[1] Although this case does not fall within the confines of Rule 52, Ala. R.App. P., "Anonymity in Appellate Proceedings, Opinions, and Case Styles," this Court has determined that no useful purpose would be served by disclosing the identity of the minors involved in this appellate proceeding. In order to maintain the anonymity of the minors, it is necessary to also maintain the anonymity of the parents. Therefore, those parties will be referred to using initials.
[2] B.B. was subsequently dismissed from the case as a party plaintiff because he was not C.J.'s natural father but was her stepfather. Additionally, a defamation claim asserted by B.B. was dismissed and is not a subject of these appeals.
[3] M.G. had moved the trial court for a summary judgment as to the claims asserted against him by the plaintiffs. However, a dispute arose between M.G. and the plaintiffs regarding M.G.'s Fifth Amendment privilege. Because M.G. invoked his Fifth Amendment privilege, the trial court did not consider the merits of his summary-judgment motion and the claims against him remain pending.
[4] The trial court determined in its summary-judgment order that G.H. and L.H. had abandoned their claims against the defendants and dismissed all claims asserted by G.H. and L.H. against the defendants with prejudice. Accordingly, G.H. and L.H. are not parties to case no. 1040486.
[5] G.G. is M.G.'s mother.
[6] The parents state in their brief to this Court that they were shown a different set of photographs than those submitted under seal to the trial court and to this Court. However, they did not deny that the photographs shown to them during those meetings were photographs of their daughters. Further, it is undisputed that the photographs reviewed by the trial court and that are a part of the record on appeal are copies of the photographs made by the students and e-mailed to M.G.
[7] Negligence and wantonness are two distinct tort concepts of actionable culpability; consequently, they are defined by differing elements, and caselaw cited in support of a negligence claim will not properly support a wantonness claim. See Exparte Anderson, 682 So.2d 467 (Ala. 1996). *Page 102